1
2
3
4

Bright Harry
37421 Gillett Road
Fremont, CA 94536
bharry77@hotmail.com
(510) 396-7128

FILED

APR 2 6 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

Free
paid
iss.
1 DC

5          **UNITED STATES DISTRICT COURT**

6          **NORTHERN DISTRICT OF CALIFORNIA**

7    Bright Harry
                    **Plaintiff,**
8         vs.

9    _____,
     KCG Americas LLC ("KCG"),
10   Daniel B. Coleman, CEO of KCG
     Carl Gilmore, Director of KCG Futures
11   Greg Hostetler, KCG Compliance Officer
     Main Street Trading, Inc. ("MST"),
12   Patrick J. Flynn, President of MST
13   Wedbush Securities Inc. ("Wedbush")
     Edward W. Wedbush, President of Wedbush
14   ION Trading, Inc. ("ION")
15   Andrea Pignataro, CEO of ION, Global
     Robert Sylverne, CEO of ION, USA
16   Computer Voice Systems, Inc. ("QST")
17   Paul Sturm, CEO of QST and
     Scott William Benz, VP
18
19                  **Defendants**
20

**Case Number** **C17 - 2385** MEJ

**COMPLAINT FOR:**

**1. FRAUDULENT CONCEALMENT**
**2. FRAUDULENT MISREPRESENTATIONS**
**PROVEN BY CONSISTENT PATTERN OF**
**FAILURE OF DEFENDANTS' ELECTRONIC**
**TRADING FACILITY, PLATFORMS AND**
**COMPUTER SERVERS**
**3. BREACH OF FIDUCIARY DUTY**
**4. FRAUDULENT MANIPULATION OF**
**PLAINTIFF'S ELECTRONIC ORDERS**
**5. FAILURE TO SUPERVISE TO DEFRAUD**
**6. AIDING AND ABETTING FRAUD and**
**7. EMPLOYMENT OF MANIPULATIVE**
**DEVICES/SCHEME TO DEFRAUD, violating,**

<u>Federal Statutes:</u>
FRCP §9(b), 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b,
7 U.S.C. §7a-2, ), 7 U.S.C. §13c(a), CEA §6(c)(1),
18 U.S.C. §2 and 7 U.S.C. § 25
<u>California Statutes:</u>
CCC §1572, CCC §1573, CCC §1709, CCC
§1710, and CCC §3294
<u>NFA Rules:</u>
Rules 2-2, 2-4, 2-9, 2-26, 2-29, 2-30, 2-38

**JURY TRIAL DEMANDED**

21
22
23
24
25

26   **COMPLAINT FOR COMPENSATORY, CONSEQUENTIAL AND OTHER**

27   **DAMAGES FROM DEFENDANTS, FOR VIOLATING THE COMMODITY**

     **EXCHANGE ACT, CALIFORNIA STATUTES AND NFA RULES**
28

# TABLE OF CONTENTS

| No. | Description | Pg |
|---|---|---|
| I. | SUMMARY OF THE COMPLAINT................................................ | 3 |
| II. | NATURE OF THE ACTION................................................ | 4 |
| | A. Plaintiff's Commodity Futures Trading Business Activities........................... | 7 |
| | B. The Operation of Defendants' Common Enterprise........................................ | 8 |
| | C. Defendants' Business Activities................................................ | 8 |
| III. | JURISDICTION................................................ | 9 |
| IV. | VENUE................................................ | 9 |
| V. | INTRADISTRICT ASSIGNMENT................................................ | 9 |
| VI. | PARTIES................................................ | 9 |
| | A. Plaintiff................................................ | 9 |
| | B. Defendants................................................ | 9 |
| VII. | FACTUAL ALLEGATIONS OF MANIPULATIVE, WILLFUL AND/OR RECKLESS MISCONDUCTS OF COMMITTING FRAUD THROUGH........ | 13 |
| | A. CONCEALMENT................................................ | 13 |
| | A1 By Defendants MST, Flynn, and KCG and its officers, employees and agents, prior to opening Account #TSMPF148 ...................... | 13 |
| | A2 By Defendants MST, Flynn, and Wedbush and its officers, employees and agents, prior to transferring Account #TSMPF148 ..................... | 15 |
| | B. MISREPRESENTATIONS BY DFENDANTS, FIRMLY PROVEN BY THE CONSISTENT PATTERN OF FAILURE OF THEIR ELECTRONIC TRADING FACILITY, PLATFORMS AND COMPUTER SERVERS................ | 17 |
| | C. BREACH OF FIDUCIARY DUTY................................................ | 31 |
| | D. MANIPULATION OF PLAINTIFF'S ELECTRONIC TRADE ORDERS....... | 31 |
| | E FAILURE TO SUPERVISE................................................ | 31 |
| | F AIDING AND ABETTING................................................ | 34 |
| | G. DEFENDANTS' EMPLOYMENT OF MANIPULATIVE DEVICES AND SCHEME................................................ | 34 |
| VIII. | CAUSES OF ACTION................................................ | 34 |
| | A. First Cause of Action (FRAUDULENT CONCEALMENT)............................ | 55 |

   B.   Second Cause of Action (FRAUDULENT MISREPRESENTATIONS, PROVEN BY CONSISTENT PATTERN OF FAILURE OF DEFENDANTS' ELECTRONIC TRADING FACILITY, PLATFORMS AND COMPUTER SERVERS........................ 37

   C.   Third Cause of Action (BREACH OF FIDUCIARY DUTY)............................. 38

   D.   Fourth cause of Action (DEFENDANTS' FRAUDULENT MANIPULATION OF PLAINTIFF'S ELECTRONIC TRADE ORDER)......................................... 38

   E.   Fifth Cause of Action (DEFENDANTS' FAILURE TO SUPERVISE)............. 38

   F.   Sixth Cause of Action (DEFENDANTS' AIDING AND ABETTING FRAUD).. 38

   G.   Seventh Cause of Action (EMPLOYMENT OF MANIPULATIVE DEVICES AND SCHEME BY DEFENDANTS, TO DEFRAUD PLAINTIFF)................ 38

IX.   CONCLUSION.................................................................................................. 38

X.   DEMAND FOR RELIEF..................................................................................... 38

XI.   DEMAND FOR JURY TRIAL............................................................................ 38

Plaintiff Bright Harry ("Harry"), by his own experiences and investigation, and information and belief, allege as follows:

# I.   SUMMARY OF THE COMPLAINT

**Defendants' Malicious, Willful and Manipulative Scheme to Defraud Plaintiff Bright Harry, in violation of Federal Statutes: FRCP §9(b), 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b, 7 U.S.C. §7a-2, ), 7 U.S.C. §13c(a), CEA §6(c)(1), 18 U.S.C. §2 and 7 U.S.C. §25; California Statutes: CCC §1572, CCC §1573, CCC §1709, CCC §1710 and CCC §3294; and NFA Rules: 2-2, 2-4, 2-9, 2-26, 2-29, 2-30 and 2-38**

1. Plaintiff Bright Harry ("Harry") files this action to recover at least $45 million in damages and other appropriate relief arising from the Willful and Malicious Manipulative Misconducts of Defendants KCG Americas LLC ("KCG"), Daniel B. Coleman, ("Coleman"), CEO of KCG, Carl Gilmore ("Gilmore"), Director of KCG Futures, Greg Hostetler ("Hostetler"), Chief Compliance Officer of KCG Futures, Main Street Trading, Inc. ("MST"), Patrick J. Flynn ("Flynn"), President of MST, Wedbush Securities Inc. ("Wedbush"), Edward W. Wedbush ("E. Wedbush"), President of Wedbush, ION Trading, Inc. ("ION"), Andrea Pignataro ("Pignataro"), CEO of ION- Global, Robert Sylverne ("Sylverne"), CEO of ION-USA, Computer Voice Systems, Inc. ("QST"), Paul Sturm ("Sturm"), CEO of QST and Scott William

Benz ("Benz"), VP of QST, from at least November 2013 to April 2015 (the "Relevant Period"), to defraud Plaintiff Harry.

2. Starting with Intentional or Willful, Manipulative Fraudulent Concealment in 2013 and ending up with Maliciously Willful Manipulative Operational Failures and other Unlawful Acts in 2015 to defraud Plaintiff Bright Harry, the aforementioned Defendants violated Federal Statutes: FRCP §9(b), 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b, 7 U.S.C. §7a-2, ), 7 U.S.C. §13c(a), CEA §6(c)(1), 18 U.S.C. §2 and 7 U.S.C. §25; California State Statutes: CCC §1572, CCC §1573, CCC §1709, CCC §1710 and CCC §3294; and NFA Rules: 2-2, 2-4, 2-9, 2-26, 2-29, 2-30 and 2-38, costing Plaintiff at least $45 million in Direct Damages and Consequential Damages in Lost Profits and Opportunity Cost.

## II. NATURE OF THE ACTION

3. Plaintiff Bright Harry ("Harry") formed a Trading Business Venture with his Friend, Ronald S. Draper ("Draper") in 2013 to Trade Electronic Commodity Futures Spreads, which Harry specializes in. The very essence or heart of this trading business venture is the precise combination of technology, intellectual Capital and knowledge Capital in Harry's possession for trading the Commodity Futures Spreads. Without this combination, especially the Experiential Knowledge and Intellectual Capital of Harry, Harry and Draper have no Electronic Commodity Futures Spreads Trading Business. Knowledge and Technology are the very foundation of 21st century business ventures. In other words, electronic commodity futures spread trading is a knowledge-intensive, technology-driven business, moving at the speed of light. To take advantage of Harry's knowledge, technology and intellectual Capital to make money, Ronald S. Draper joined forces with Plaintiff Bright Harry by contributing the Initial Trading Financial Capital of $275,000, while Harry contributed all the Operational Financial Capital (Operational Expenses), Technology Capital, Intellectual Capital and Knowledge Capital (Planning, Analyzing, Strategizing and Executing the Trading Plans), and Labor Capital (Physical Labor or Effort in placing the Electronic Commodity Futures

Orders and Monitoring them 24/6). 24/6 means that the Electronic Commodity Futures Market operates 24 hours a day, 6 days a Week, excluding holidays; and Saturdays, and Harry was responsible for placing the electronic trade orders and monitoring them 24/6, a very brutal trading schedule for anyone. It's not for the feint-hearted.

4. Thus, on November 6, 2013, Harry and Draper opened a Commodity Futures Trading Account with the Clearing Futures Commission Merchant ("FCM"), KCG Americas LLC ("KCG"), through its Introducing Broker, Main Street Trading, Inc. ("MST") and its President, Patrick Joseph Flynn ("Flynn"). This common Commodity Futures Trading Account ("Account #TSMPF148"), belonging to Harry and Draper was opened under Draper's name only for easier tax filing with the IRS, and for Draper to have full control of his $275,000 Initial Trading Capital at the start of this Trading Business Venture. This consensual arrangement gave Draper the Authoritative Power to close out all trading positions and even the Trading Account itself at his discretion, since he was not actively involved in the actual Commodity Futures Trading; only Harry was.

5. In violation of NFA Rule 2-26, MST and its President, Flynn, and KCG and its Officers and Employees including Daniel B. Coleman ("Coleman"), the CEO, Carl Gilmore ("Gilmore"), Head of KCG Futures (the Futures Division of KCG), and Greg Hostetler ("Hostetler"), the Chief Compliance Officer of KCG Futures, knowingly and willfully concealed from Harry and Draper, the Financial Malfeasances of KCG, especially its near bankruptcy on August 1, 2012, the numerous litigations against KCG, and several of KCG's Unlawful Misconducts, and opened Draper's and Harry's Account. Had Flynn, Coleman, Gilmore and Hostetler not breached their Legal Duty to Disclose to Plaintiff Harry and Draper, the precarious financial situation of KCG and its numerous Unlawful Acts, as required by NFA Rule 2-26, Harry and Draper would  never have opened their Trading Account with KCG.

6. Furthermore, due to its precarious financial situation, KCG sold its Futures Division, KCG Futures to Wedbush Securities, Inc. ("Wedbush") and it became

Wedbush Futures on December 1, 2014. Again, in violation of NFA Rule 2-26, MST and its President, Flynn, and Wedbush and its Officers and Employees including Edward W. Wedbush ("E. Wedbush"), the President, Carl Gilmore, now Head of Wedbush Futures (the Futures division of Wedbush), and Greg Hostetler, now Chief Compliance Officer of Wedbush Futures, willfully concealed from Harry and Draper, the numerous litigations against Wedbush, and several of Wedbush's misconducts in violation of the Commodity Exchange Act and State Laws, and transferred Account #TSMPF148 from KCG to Wedbush. Had Flynn, Edward Wedbush, Gilmore and Hostetler not breached their Legal Duty to Disclose to Plaintiff Harry and Draper, the numerous litigations against Wedbush and it's numerous violations of the Exchange Regulations, as required by NFA Rule 2-26, Harry and Draper would never have allowed the transfer of their Commodity Futures Trading Account from KCG to Wedbush on December 1, 2014.

7. These aside, the mind-boggling, egregiously manipulative fraud perpetrated by Defendants, especially ION and Wedbush on April 28, 2015, forced Harry to close out all the open trading positions in Harry's and Draper's Account, and to never ever trade with or have any business dealings whatsoever with all the Defendant-Fraudsters

8. Ironically, Harry and Draper moved their Futures Trading Account from OEC/Daniels Trading to KCG in November 2013 because of the extremely difficult OEC Trading Platform, which had no Exchange-Traded Spreads in combination with Exchange-Traded Spread Charts, that Defendants QST/KCG had. QST and MST touted the tight integration and seamless interconnectivity of QST, the Front-end Trading Platform of KCG, to the rest of KCG's electronic commodity futures trading facility, which lured Harry and Draper to KCG, only to learn the hard way, that all the Defendants were Fraudsters, especially the FCM-Defendants, KCG and Wedbush. The magnitude of the immense fraud of defendant-fraudsters can be seen in Table 2 below, which compares the performance results of Plaintiff's first five months of Trading at OEC/Daniels Trading and QST/KCG. The performance results are like, night and day,

lucidly showing the immensity of defendants' Fraud, where Harry made $36,000 profit with his former Brokers, OEC-Daniels Trading within the first five months of trading, and lost $217,000 with Defendant-Fraudsters, also within first five months.

| Table 2 | | | |
|---|---|---|---|
| **Comparing Profits for the first 5 months of trading at OEC/Daniels Trading (Previous Brokers) and /MST/KCG or Defendants** | | | |
| **Monthly Profits at OEC/Daniels Trading Platform, from July 2013 to November 2013** | | **Monthly Profits at MST/KCG/QST Platform, from November 2013 to March 2014** | |
| **Month** | **Profit/(Loss)** | **Month** | **Profit/(Loss)** |
| July | $33,000.00 | November 2013 | $4,498.70 |
| August | $39,500.00 | December 2013 | -$12,050.90 |
| September | $9,425.00 | January 2014 | -$27,724.06 |
| October | -$53,375.00 | February 2014 | -$131,825.00 |
| November | $11,250.00 | March 2014 | -$46,340.55 |
| **Semi-Total** | **$39,800.00** | **Semi-Total** | **-$213,441.81** |
| Commissions/Fees | -$3,485.20 | Commissions/Fees | -$4,060.00 |
| **Total** | **$36,314.80** | **Total** | **-$217,501.81** |

Exhibit xviii

## A. Plaintiff's Commodity Futures Trading Business Activities

9. The trading on electronic trading platforms transmits market participant orders to a matching engine that aggregates the orders from across the market in each contract, then matches the orders to buy with orders to sell at the same price, generally following a "first-in, first-out" priority. Moreover, a relationship also exists between the price of an order and its execution. A price either can be "aggressive" or "passive" depending on where the price is located compared to the current "bid-ask spread" between the highest priced bid to buy and the lowest price offer (or "ask") to sell. A passive order cannot be immediately matched upon receipt by the Commodity Futures Exchange. Overall, the higher the limit price on a buy order, the more aggressive it is, and the lower the limit price on a sell order, the more aggressive it is.

10. The electronic trading platform also distributes information back to market participants, such as order matches and executions, cancellations, changes in sizes or

quantities, and changes in prices. From the perspective of market participants trading on the electronic platform, only the number of orders at various price levels and the number of contracts at each price level are visible; the identity of the originating market participant for each order is not. Market participants view this data through the market data feed and incorporate trading strategies based, in part, on that information.

11. Plaintiff Harry manually traded these electronic futures markets through Computer Voice Systems' QST, the Front-end Trading Platform of KCG's and later Wedbush's Electronic Commodity Futures Trading Facility. All Harry does when the right trading signal appears on his Computer Screen, is to simply click the "blue buy-button" on the screen to buy the Commodity Futures Spread Contract or just click the "red sell-button" to sell the Contract, with his Computer Mouse. It's as simple as that.

**B. The Operation of Defendants' Common Enterprise**

12. Once Harry clicks his buy or sell electronic trade order, it is immediately routed through KCG's or Wedbush's Electronic Commodity Futures Trading Facility to the Commodity Exchanges like CME, CBOT or ICE and Cleared in milliseconds or even microseconds, almost at the speed of light. Electronic Futures Trading is meant to be that fast through Defendants' Common Enterprise consisting of Computer Voice System's QST Front-end Platform connected to ION Trading's RANorder Application Programming Interface (API) and Backend, that is in turn connected to the Exchange Platforms like CME Globex. This common enterprise is the Electronic Commodity Futures Trading Facility under the control and supervision of KCG or Wedbush.

**C. Defendants' Business Activities**

13. Defendant QST is fully responsible for the QST Front-end Platforms and always ensures that it is fully functional and always tightly integrated within the Common Enterprise. ION is fully responsible for its RANorder API and Backend and is duty-bound to always ensure a seamless and tight interconnectivity between the QST Front-end and the Commodity Exchange Platforms like CME Globex. The FCM-Defendants, KCG and Wedbush are responsible for the whole Common Enterprise, the

total Electronic Commodity Futures Trading Facility, in terms of its constant and continuous interconnectivity, and with redundancies in case of operational failures.

## III. JURISDICTION

14. This court has subject matter jurisdiction over this action pursuant to FRCP §9(b), 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b, 7 U.S.C. §7a-2, ), 7 U.S.C. §13c(a), CEA §6(c)(1), 18 U.S.C. §2 and 7 U.S.C. §25.

## IV. VENUE

15. Venue is proper pursuant to FRCP §9(b), 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b, 7 U.S.C. §7a-2, ), 7 U.S.C. §13c(a), CEA §6(c)(1), 18 U.S.C. §2 and 7 U.S.C. §25, and because the events giving rise to the claims asserted herein occurred in this judicial district.

## V. INTRADISCTRICT ASSIGNMENT

16. This Lawsuit should be assigned to San Francisco/Oakland Division of this Court because the Account Opening Agreement was signed in Fremont, Alameda County, California, and the Events giving rise to the Claims asserted herein occurred in this Judicial District.

## VI. PARTIES

**A. PLAINTIFF**

17. At all times herein mentioned, Bright Harry ("Harry") is a natural person resident in Fremont, located in Alameda County in the State of California. Bright Harry is a Plaintiff who actually traded the Commodity Futures Spreads in Account TSMPF148, under Draper's name. Harry is an Engineer by Profession and ran his own Engineering Companies for more than a decade.

**B. DEFENDANTS**

18. Defendant KCG Americas LLC ("KCG") is now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of New Jersey. It has been registered with the Commission as a broker-dealer since 2009. It is a subsidiary of Knight Capital Holdings LLC. It

had a Futures Division called KCG Futures until December 1, 2014 when it sold it to Wedbush Securities, Inc., and KCG Futures became Wedbush Futures, from December 1, 2014. KCG is a Clearing FCM.

19. Daniel B. Coleman D ("Coleman") is the Chief Executive Officer of KCG Americas LLC and previously had the NFA ID Number 0296692, approved as Principal on 01/04/2000 and withdrawn on 03/31/2010. He is a controlling person of KCG Americas LLC, a registered entity with NFA and CFTC. As CEO of KCG Americas LLC, he holds and exercises direct or indirect control over KCG, and was instrumental in the sale of KCG Futures to Wedbush Securities Inc. on December 1, 2014. Also as CEO, one of his core duties is to ensure that both KCG Americas LLC and KCG Futures complied with all the relevant laws and Statutes, particularly those of the CEA and NFA..

20. Defendant Carl W. Gilmore ("Gilmore") resides in Oak Park, Illinois. Gilmore was the Head of KCG Futures, the Futures Division of KCG Americas LLC from February 2013 to December 1, 2014 and also Head of Wedbush Futures, a division of Wedbush Securities, Inc from December 2, 2014 to December 15, 2015. His NFA ID # is 0249249, approved on 5/31/2012 as Principal for KCG Americas LLC, withdrawn on 12/1/2014, approved as Principal for Wedbush Securities, Inc. on 12/1/2014 and withdrawn on 12/15/2015. He was responsible for all aspects of managing and operating a top 30 futures commission merchant and clearing member at CME, CBOT, NYMEX, COMEX, ICE US, MGEX, KCBOT, LCH, ICE Europe. He,

- Designed and implemented strategic goals.
- Reduced operational costs by 34%, while increasing revenue by 12%.
- Reduced headcount by 40%, while increasing operational capacity by 25%.
- Reorganized and automated operations to increase efficiency and workflow.
- Designed, implemented and completed a strategic plan for returning FCM business to a cash flow positive state.
- Implemented exception management workflows.

- Re-organized and automated operational, risk, and compliance functions.
- Re-organized sales force and instituted a 5 step sales plan designed to focus sales force on specific target markets and client types.
- Reviewed and executed CEO Certification pursuant to CFTC regulations.
- Designed a project for incorporating swaps execution and clearing into the FCM, including operational, risk, compliance and financial requirements

15. Greg Hostetler ("Hostetler") resides in Madison, Wisconsin. Hostetler was the Director of Compliance at KCG Futures, a Division of KCG Americas LLC, from about 2012 to December 1, 2014. From December 2, 2014, he was the Chief Compliance Officer for Wedbush Futures, a Division of Wedbush Securities, Inc. His NFA ID Number is 0312238, approved on 5/30/2012 as Principal for KCG Americas LLC, and withdrawn on 12/1/2014. Greg Hostetler was responsible for all the Compliance issues at both KCG Futures and the later Wedbush Futures.

21. Defendant Main Street Trading, Inc. ("MST") is now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of California. Main Street Trading, Inc. (MST") was the Introducing Broker to KCG Americas LLC until December 1, 2014, when KCG Futures, the Futures Division of KCG Americas LLC was sold to Wedbush Securities, Inc., and became Wedbush Futures, the Futures Division of Wedbush Securities, Inc. Main Street Trading then became the Introducing Broker of Wedbush Securities, Inc, and still is.

22. At all times herein mentioned, Defendant Patrick Joseph Flynn ("Flynn") is a natural person resident in Lake Forest, located in Orange County in the State of California. Flynn has been the President and is still the President of Main Street Trading, Inc.

23. Defendant Wedbush Securities, Inc. ("WedBush") is now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of California. Defendant Wedbush Securities Inc., the

parent company of Wedbush Futures, bought KCG Futures from KCG Americas LLC on December 1, 2014, and converted KCG Futures into Wedbush Futures, its Futures Division. Wedbush is a Clearing Futures Commission Merchant ("FCM").

24. Defendant Edward W. Wedbush ("E. Wedbush") resides in Los Angeles, California. R. Wedbush is the Founder of Wedbush Securities Inc. and serves as its Chief Executive Officer and President. His NFA ID Number is 0086860, approved as Principal since 04/20/2009. As CEO of Wedbush Securities, Inc, he held and exercised direct or indirect control over Webush Securities, Inc., and was instrumental in the purchase of KCG Futures

25. Defendant Computer Voice Systems, Inc. ("QST") is now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of Illinois. It is an Independent Software Provider to whom KCG and later Wedbush outsourced the Front-end of their Electronic Trading Facility. This front-end owned by Computer Voice Systems, Inc is the QST Platform. QST is a very critical agent of KCG and later Wedbush, and aided and abetted KCG and Wedbush.

26. Defendants ION Trading, Inc. ("ION") is now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of Illinois. It is an Independent Software Provider to whom KCG and later Wedbush outsourced the Interface and Backend of their Electronic Trading Facility. ION provided the RANorder Application Programming Interface ("API") that connected the QST Front-end and ION Backend to the Commodity Futures Exchanges like CME and ICE. The RANorder API and Backend are owned by ION Trading, Inc. ION is a very critical agent of KCG and later Wedbush, and aided and abetted KCG and Wedbush.

27. Accordingly, pursuant to Section 6c of the Act, at all times herein mentioned, each of the Defendants herein above was the agent, partner, servant, employee, alter ego, aider and abettor, co-conspirator and/or joint venturer of each of the remaining Defendants herein, and were all times acting within the scope and purpose of said

agency, partnership, service, conspiracy, and/or joint venture, and each Defendant has ratified and approved the acts of each of the remaining Defendants.

# VII.  FACTUAL ALLEGATIONS OF MANILPULATIVE, WILLFUL AND/OR RECKLESS MISCONDUCTS TO COMMIT FRAUD THROUGH

## A.  <u>CONCEALMENT (FRAUDULENT CONCEALMENT}</u>

**A1. Fraudulent Concealment by Defendants MST, Flynn, and KCG and its Officers, Employees, and Agents Prior to Opening Plaintiff's Commodity Futures Trading Account**

28. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

29. On November 6, 2013, Clearing FCM-Defendant KCG Americas LLC ("KCG"), through its Agent, Patrick Joseph Flynn, President of Main Street Trading, Inc ("MST"), the Introducing Broker, entered into a Customer Futures Agreement with Plaintiff Harry and his Trading Business Partner, Draper, without Flynn and KCG providing Harry and Draper with the "FCM-Specific Disclosure Document" of 2013, as required by NFA Rule 2-26. Thus, Defendants, especially the Clearing FCM-Defendant KCG violated NFA Rule 2-26 even before the Customer Futures agreement was signed, to defraud Plaintiff Bright Harry and his Trading Business Partner, Ronald S. Draper, as explicitly detailed below.

30. From about November 1, 2013 through April 28, 2015, Main Street Trading, Inc. ("MST"), an NFA-registered introducing broker ("IB"), through its employee and President, Patrick Joseph Flynn ("Flynn"), and Flynn directly, engaged in acts and practices that violated Section 4b of the Commodity Exchange Act (7 U.S.C.§ 6b) (the "Act"), NFA Rule 2-26 and CEA § 6(c)(1). Specifically, Flynn, while acting on behalf of Main Street Trading, Inc., and in conjunction with his chosen, Clearing-FCM, KCG America's LLC, ("KCG",) failed to provide Plaintiffs, Harry and Draper the required KCG "FCM-Specific Disclosure Document", before opening their Commodity Futures

Trading Account ("Account #TSMPF148") on November 6, 2013, violating NFA Rule 2-26.

31. Flynn committed the acts and omissions described herein within the course and scope of his employment at MST, and as an agent of KCG. Subsequently, KCG Americas LLC is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), as principal for its agent's acts constituting violations of the Act.

32. Furthermore, from about November 6, 2013 to December 1, 2014, Clearing FCM-Defendant KCG Americas LLC, ("KCG") by and through its agents, officers, or persons acting within their employment, agency, or office with KCG, including its CEO, Daniel B. Coleman, its Head of KCG Futures, Carl W. Gilmore, and its Chief Compliance Officer, Greg Hostetler, failed to provide Plaintiff Harry and Draper, the required "FCM Disclosure Document", before opening the Trading Account #TSMPF148 on November 6, 2013, thus, violating NFA Rule 2-26, while concealing very critical material facts from Plaintiff and Draper, thereby violating CEA § 6(c)(1).

33. Daniel B. Coleman, Carl W. Gilmore, and Greg Hostetler committed the acts and omissions described herein within the course and scope of their employment at KCG Americas LLC. Subsequently, KCG Americas LLC is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), as principal for its agents' acts constituting violations of the Act.

34. Had MST and Flynn, and KCG through its agents, MST and Flynn, and through its Officers, Daniel B. Coleman, Carl W. Gilmore, and Greg Hostetler not violated NFA Rule 2-26, Plaintiff Harry and Draper would have known of the fraudulent, concealed material facts about KCG as described below, and hence, would never have opened a Commodity Futures Trading Account with KCG. By Harry and Draper not opening such a Futures Trading Account with KCG, the aforementioned Defendants would not have been able to further commit the following violations: **Federal Statutes:** FRCP §9(b), 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b, 7 U.S.C. §7a-2, 7 U.S.C. §13c(a), CEA §6(c)(1), 18 U.S.C. §2 and 7 U.S.C. §25; **California Statutes:**

CCC §1572, CCC §1573, CCC §1709, CCC §1710, and CCC §3294; and **NFA Rules:** 2-2, 2-4, 2-9, 2-29, 2-30, 2-38, to defraud Plaintiff Harry and Draper

35. This is not the first time Defendants, especially the FCM-Defendants have used their collective monopoly over their Electronic Trading Facility to manipulate the market to defraud their Customers. As a matter of fact, the FCM-Defendants prior unlawful acts are similar to the current unlawful acts against Plaintiffs.

36. The Clearing FCM-Defendants, KCG and Wedbush, separately, have been investigated, sued and fined by SEC, CFTC, FINRA and other Agencies, and even by individual Traders, for their unlawful acts in Securities Transactions and Commodity Futures Trading Misconducts, violating Exchange Regulations, NFA Regulations and State Statutes, encompassing egregious manipulative frauds. The following is a list of such investigations, litigations and fines or penalties, starting with KCG, and followed by WedBush.

**KCG**
a) Class action suit against KCG for Misrepresentations and lack of appropriate enterprise-wide risk controls in Electronic Trading that led to massive losses."[CASE NO. 2:12-cv-06760-SDW-MCA]"
b) SEC v. Knights Capital Americas LLC Administrative Proceeding , File No. 3-15570, on October 16, 2013. Operational Failures, especially Market Access Failures that violated the Exchange Act.
c) From Reuters of April 9, 2015: **Exclusive: U.S. investigates market-making operations of Citadel, KCG.** Federal authorities are investigating the market-making arms of Citadel LLC and KCG Holdings Inc, looking into the possibility that the two giants of electronic trading are giving small investors a poor deal when executing stock transactions on their behalf. "[The Justice Department has subpoenaed information from Citadel and KCG (KCG.N) related to the firms' execution of stock trades on behalf of clients, according to people familiar with the investigation]". "[The documents subpoenaed from KCG related to the firm's market making activities from 2009 to 2011, according to a person familiar with the KCG probe......]".
d) Class Action Suit against KCG and others for violation of Securities Laws, filed 06/13/2014 [Case 1:14-cv-04321-JM].

**A2. Fraudulent Concealment by the Introducing Broker, MST and its President, Flynn, and Wedbush and its Officers, Employees and Agents, before transferring Harry's and Draper's Account TSMPF148 from KCG to Wedbush**

37. From December 1, 2014 to April 28, 2015, Clearing FCM-Defendant Wedbush Securities, Inc, ("Wedbush") by and through its agents, officers, or persons acting within their employment, agency, or office with Wedbush, including its CEO and President, Edward W. Wedbush, its Head of Wedbush Futures, Carl W. Gilmore, and its Wedbush Futures Chief Compliance Officer, Greg Hostetler, failed to provide Plaintiffs Draper and Harry, the required "FCM Disclosure Document", before transferring Plaintiffs' Commodity Futures Trading Account TSMPF148 from KCG Futures (a Division of KCG Americas LLC) to Wedbush Futures (a Division of Wedbush Securities, Inc.) on December 1, 2014, violating NFA Rule 2-26, while. also concealing very critical material facts about the financial malfeasances of Wedbush from Plaintiffs, thereby violating CEA §6(c)(1).

38. Edward W. Wedbush, Carl W. Gilmore, and Greg Hostetler committed the acts and omissions described herein within the course and scope of their employment at Wedbush Securities, Inc. Subsequently, Wedbush Securities, Inc. is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), as principal for its agents' acts constituting violations of the Act.

39. Had Wedbush through its Officers, Edward W. Wedbush, Carl W. Gilmore, and Greg Hostetler not violated NFA Rule 2-26, Plaintiff Harry and Draper would have known of the fraudulent Misconducts of Wedbush in the commodity futures business and the numerous lawsuits against Wedbush as listed below.

**WedBush**

a) SEC vs. Wedbush, **[Administrative Proceeding, File No. 3-15913].**

b) FINRA Charges Wedbush Securities for Systemic Market Access Violations, Anti-Money Laundering and Supervisory Deficiencies, FINRA, August 18, 2014.

c) SEC Sues Wedbush Securities and Dark Pool Operator Liquidnet Over Regulatory Violations, Institutional Investor Securities Blog, June 6, 2014

d) Wedbush ordered to pay $3.5M for 'morally reprehensible failure', Investment News, July 11, 2011.

e) **Wedbush to Pay Trusts, Family Members Over $813,000**
A Financial Industry Regulatory Authority Panel says that Wedbush securities

and investment advisor Kevin Thomas Scarpelli must jointly and severally pay several investors over $813,000 to resolve allegations of professional negligence and failure to supervise (November 18, 2015).

f) Wedbush has been named in at least 53 regulatory events and 52 arbitrations. Failure to supervise was a common complaint.

40. The above legal precedents corroborate Plaintiff Harry's factual allegations and affirm the indisputable facts that Defendants, especially the FCM-Defendants are deceitful and extremely fraudulent, and knowingly, intentionally or willfully and maliciously defrauded Plaintiff Harry. Had Harry and Draper known of these facts about Clearing FCM Wedbush, they would never have allowed the transfer of their Commodity Futures Trading Account from KCG Futures to Wedbush Futures. By Harry and Draper stopping this transfer, the above-mentioned Defendants would not have had the opportunity to further defraud Plaintiff, and continue their offenses against Harry, further violating **Federal Statutes:** FRCP §9(b), 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b, 7 U.S.C. §7a-2, ), 7 U.S.C. §13c(a), CEA §6(c)(1), 18 U.S.C. §2 and 7 U.S.C. §25;. **California Statutes:** CCC §1572, CCC §1573, CCC §1709, CCC §1710, and CCC §3294, and **NFA Rules:** 2-2, 2-4, 2-9, 2-29, 2-30, 2-38.

### B. DEFENDANTS' FRAUDULENT MISREPRESENTATIONS PROVEN BY THE CONSISTENT PATTERN OF FAILURE OF THEIR ELECTRONIC TRADING FACILITY, PLATFORMS AND COMPUTER SERVERS

41. Plaintiffs re-allege and incorporate each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

42. In July/August 2013, Plaintiff Harry contacted Defendant Scott William Benz ("Benz"), VP of Computer Voice Systems, Inc. ("QST") to test out their QST Trading Platform with regards to its capabilities in Commodity Futures Spread Trading. Thus, for the next three months, starting from August 12, 2013 to November 12, 2013, Harry tested the DEMO-QST Platform, and it was phenomenal in the creation of Exchange-Traded Commodity Futures Candlestick Spread Charts and in

the actual execution of Spread Trades in the QST Virtual (Simulated) Commodities Exchange like CME and ICE.

43. Benz also informed Harry that the QST Front-end Platform was tightly integrated with the Live Trading Exchange Platforms of CME, CBOT, ICE and other Commodity Exchanges. Benz emphasized that trading on the QST-DEMO Platform was not any different from trading on the QST-LIVE Platform, and that with the click of a button, Harry can switch from the QST-DEMO (Paper trading) to QST-LIVE (Live trading). The following on the QST website corroborates Benz's statement:

- QST is a revolutionary futures trading application that combines comprehensive, fast and flexible order entry/order management with world-class charting and analytics, real-time quotes and news.
- Order entry is pervasive throughout QST. From virtually any screen, you can enter and manage orders and fills.
- Integrated paper trading allows users to learn to use the interface and practice trading strategies. With the click of a button, users can toggle between paper and live trading.
- One application can consolidate order flow on Ion Trading's RANorder, or Trading Technologies, and CQG's FIX Adapter, and soon to be OAK. This gives you the flexibility to route your order flow through a single network, fully utilizing its firm-wide risk control.

44. In September/October 2013, Harry asked Benz to recommend a California Commodity Futures Brokerage Firm that uses the QST Platform as the Front-end of its Electronic Commodity Futures Trading Facility. Benz recommended Main Street Trading, Inc ("MST") and Patrick Joseph Flynn ("Flynn"). Then, Harry contacted Flynn to get more details about MST and how the electronic order execution works at MST using the QST Front-end Platform. Just like Benz, Flynn told Harry that the QST-DEMO Platform and the QST LIVE Platform were very similar, and that with the click of a button, Harry could switch from the QST-DEMO (Paper Trading) to QST-LIVE (Live trading). Flynn's website also corroborates this statement with the following excerpts:

> MSTonline features the ability to enter and manage orders and fills from virtually any screen. It also offers integrated paper trading, allowing users

to learn the MSTonline interface and practice trading strategies. With the click of a button, users can toggle between paper and live trading.

45. The following email from Flynn on November 8, 2013 further corroborates Flynn's promise of the interconnectivity of QST to RAN and the Exchanges;

"P. O. A. & RETIREMENT & DISCLOSURE

Patrick Flynn
Fri 11/8/2013, 10:33 AM You; RONALD DRAPER (rsdraper@gmail.com)

Dear Ron and Bight,

Thank you both very much.  We are all set pending funding.  As you recall, I sent the wiring instructions and formal account number to you both yesterday afternoon.  I will contact once the account has been funded and will assist as best I can with helping to secure your connectivity with QST and RAN.

Regards,

# Patrick Flynn
Main Street Trading
800 748-5083 ext 7450
949 268-7800

THE RISK OF LOSS IN FUTURES TRADING CAN BE SUBSTANTIAL.
THEREFORE, ONLY GENUINE RISK CAPITAL SHOULD BE USED FOR TRADING
PURPOSES. FUTURES AND FUTURE OPTIONS MAY NOT BE SUITABLE FOR
ALL INVESTORS. YOU SHOULD CAREFULLY CONSIDER YOUR FINANCIAL
CONDITION WHEN DECIDING WHETHER TO TRADE. PAST PERFORMANCE,
PROJECTED OR HYPOTHETICAL RESULTS ARE NOT NECESSARILY
INDICATIVE OF FUTURE RESULTS."

46. With these assurances and presentations by Benz and Flynn, and backed by the phenomenal performance of the QST-DEMO Front-end Platform with creating Exchange-Traded Spread Charts and fast execution on the Virtual Commodity Exchanges, Harry convinced his Trading Business Partner, Draper for them to open a Commodity Futures Trading Account with MST and Flynn, through his FCM, KCG. Thus, on November 6, 2013, the Trading, Account #TSMPF148 was opened. Draper then wired $275,000 into the Account and Harry started trading on November 15, 2013.

## B1. Defendants' Fraudulent Misrepresentations Proven by the Consistent Pattern of Failure of their Electronic Trading Facility, Platforms and Computer Servers in 2013

47. Plaintiffs re-allege and incorporate each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

48. Exhibit 1, shown in the "Comprehensive Exhibits" File Folder, entitled, **"Screen Print of order entry problems on November 15, 2013"**, shows that Defendants failed to route and clear Plaintiffs Trade Orders through the Commodity Futures Exchanges on 11/15/2013.

49. Exhibit 2, shown in the "Comprehensive Exhibits" File Folder, entitled, **"RAN Linking Configuration Problems of November 17, 2013"**, shows that Defendants failed to route and clear Plaintiffs Trade Orders through the Commodity Futures Exchanges on 11/17/2013. Defendants again, failed to route and clear Plaintiffs Trade Orders through the Commodity Futures Exchanges on November 18, 2013.

50. Exhibit 3 shown below and in the "Comprehensive Exhibits" File Folder, entitled, " **Trading Problems for November 21, 2013**" shows that Defendants again failed to route and clear Plaintiffs' Trade Orders through the Commodity Futures Exchange on 11/21/2013 to 11/28/2013. Hence, Harry missed the best opportunity to enter the July/November 2014 Soybean Spread and July/December 2014 Soymeal Spread. $394,400 is the total loss of these missed trade opportunities to Plaintiff, as shown in Exhibits 5a-1, 5a-2, 5b and 5i in the Computer File Folder entitled, **"Plaintiffs' Damage Claims and Method of Calculating Damages".**

| **Trading Problems for November 21, 2013** |
| --- |
| Alina Redli<br>To: bharry88@yahoo.com<br>CC: quotes_support@computervoice.com quotesgui@computervoice.ro<br>Nov 21, 2013<br><br>Hello,<br>Our development team found the problem and they are already working to fix it.<br><br>We will make an update in the weekend that will include the fix so everything should be working fine next week.<br><br>Thank you for reporting this and sorry for any inconvenience. |

--
Regards,
Alina Redli
QST Support

On 11/21/2013 9:58 AM, bharry88@yahoo.com wrote:

Placed a Spread order to sell 20 ZSF14:N14 @ 24.00 but the order was filled at (-24.00). In other words, instead of a ZSN14 buy @1253^0 and a ZSF14 sell @1279^0, ZNSF14 was bought wrongly @1303^0 and ZSF14 sold correctly @1279^0. I executed this trade as Paper trading instead of live because i was having issues with the live trading. This is really scary, having a $48,000 plus loss because of a software snaffu.

ZSF14:N14 Spread SOLD @24.00

ZSN14 Buy WRONGLY PLACED @1303^0 instead of 1253^0

ZSF14 CORRECTLY SOLD @1279^0

## Exhibit 3

51. From November 15, 2013 to December 26, 2013 the disconnections of the ION Trading RANorder Interface between the QST Platform and the Commodity Futures Exchange was simply mind-boggling. The number of disconnections in just two months were so staggering that Plaintiff lost count of them. Plaintiff was no longer certain if Defendants would successfully route and clear his trade Orders as confirmed by Exhibit 4, entitled, **RAN Problem on December 26, 2013**", below and in the "Comprehensive Exhibits" File Folder.

**RAN Problem on December 26, 2013**

At about 9:35 p.m. California time, RAN was delinked from QST, while I was attempting to execute . ZSF14 was gradually going up and I wanted to cancel my order (buy at 13.1250). Could not. Called KCG and spoke with Mark who told me that it was a QST problem. While he was looking at the problem, I rebooted the QST Software and the problem was resolved. Unfortunately, the market had gone too high for me to create the protective ZSH14 - ZSF14 Spread.

## Exhibit 4

52. Plaintiff was utterly confused and powerless to change the situation since he could not route and clear his own Trade Orders through the Commodity Futures Exchanges. Plaintiff could only click to buy or sell, nothing more. He was at the mercy

of Defendants who kept promising that the routing and clearing problems will be fixed or assuring that the problems have been fixed, as 2013 came to an end and the new year of 2014 began.

**B2. <u>Defendants' Fraudulent Misrepresentations Proven by the Consistent Pattern of Failure of their Electronic Trading Facility, Platforms and Computer Servers in 2014</u>**

53. After the nightmare of 2013, and with assurances from Defendants that whatever problems they had with their Electronic Trading System had been fixed, Plaintiff was hopeful that the new year of 2014 would be a better year. In other words, Defendants would finally exercise their Fiduciary Duty to Plaintiff by promptly filling his Trade Orders when he clicks the "buy" or "sell" button. Unfortunately the new year did not bring Plaintiff good tidings as the violations of Defendants continued.

54. 2014 begins with Exhibit A1-a shown in the "Comprehensive Exhibits" File Folder, entitled, **"Trading Problems of January 3, 2014"**. This is an email correspondence between Defendant QST and Harry with regards to another break or disconnection of ION Trading's RANorder link to the exchange on 1/2/2014 and 1/3/2014, preventing Plaintiff from closing out their positions, resulting in a humongous loss.

55. Exhibit A1-b, in the "Comprehensive Exhibits" File Folder. entitled " **uploaded client logs from BHarry (03/Jan/2014 13:06:00 -> 03/Jan/2014 13:07:00) (6)**" gives more comprehensive email exchanges between Defendant QST and Plaintiff. In both Exhibits A1-a and A1-b, Defendant QST showed a screenshot pointing at where to select the right Account in the Account List for trading, as if that was the problem. The Account List was totally blank and hence, impossible to select from a non-existent menu.

56. Exhibit A3 shown in the "Comprehensive Exhibits" File Folder, entitled **"Trading Problems of October 22, 2014"**, confirms and corroborates the same problem of January 2, 2014 and January 3, 2014 --- blank drop-down box with no Account Menu to select from. The screenshot at the top states "invalid username or

password", while the bottom screenshot is totally blank. Plaintiff did not change any information on his side for this to occur on October 22, 2014, as happened on January 2, 2014 and January 3, 2014.

57. This was the same occurrence on December 26, 2013 as shown by Exhibit 4 in B1 of 2013, entitled "**RAN Problem on December 26, 2013**". Defendant ION Trading's RANorder link to the Commodity Futures Exchange was also broken on December 26, 2013. In other words, Defendant ION Trading's RANorder link to the Commodity Futures Exchange disconnected frequently from December 26, 2013 to October 22, 2014, almost a full year. Simply mind-boggling.

58. Exhibit A2 shown in the "Comprehensive Exhibits" File Folder, is the lacuna, entitled "**Costliest Error due to RAN Link break on 1/2/2014 and 1/3/2014**". The contents of Exhibit A2 are quite explicit. Instead of successfully closing out his positions on 1/2/2014 with a profit of $10,000, or closing them out for a profit of $6,500 on 1/3/2014, Plaintiff ended up losing $127,600 by 2/24/2014. Same Defendant ION Trading's RANorder disconnection convulsed into a horrendous nightmare, and a humongous loss. Trading is a mind game. Just a little hiccup can cause tremendous damage. Almost 50% of Harry's and Draper's Account was wiped out because of one simple act -- Defendant ION Trading's RANorder link break or disconnection on 1/2/2014 and 1/3/2014.

59. Exhibit A4, shown in the "Comprehensive Exhibits" File Folder, entitled "**Email Correspondences of January 6 and 7, 2014**", is specific to the occurrences of 1/2/2014 and 1/3/2014.

60. Exhibit A5, shown in the "Comprehensive Exhibits" File Folder, entitled "**Unbelievable Occurrences and errors at about 12:00 midnight California time on 1/15/2014**", is probably a QST problem where the trading chart suddenly disappeared. Without the chart, it was difficult to trade. Another nightmare for Plaintiff. The contents of the document are quite lucid.

61. Exhibit A6, shown in the "Comprehensive Exhibits" File Folder, entitled **"Platform Problems of March 10, 2014"**, is a QST Problem that also almost wiped out Plaintiffs' Account. In this case, Plaintiff was not informed by the Technical Department of QST that the Pre-release version and the "Normal" version were different, when executing on the Commodity Futures Exchanges. The charts and data were all the same, no visible difference. Plaintiff only knew there was a difference when the Trade Orders were not filled by Defendants and Harry's and Draper's Account  was almost blown away.

62. Exhibit A7, shown in the "Comprehensive Exhibits" File Folder, entitled **"RAN Problem on May 16, 2014"**, is another Defendant ION Trading's RANorder connection problem. The contents of the email exchange are quite explicit.

63. Exhibit A8, shown in the "Comprehensive Exhibits" File Folder, entitled **"Cannot place a Limit Order, only Market Order on May 16, 2014"**, is the screenshot of the same Defendant ION Trading's RANorder problem in #63 above.

64. Exhibit A9, shown in the "Comprehensive Exhibits" File Folder, entitled **"Platform Problems of May 19, 2014"**, is Defendant QST Problem. The contents are quite lucid.

65. Exhibit A10, shown in the "Comprehensive Exhibits" File Folder, entitled **"Problems with RAN on June 30, 2014"**, is Defendant ION Trading's RANorder Problem. The email contents are very clear.

66. Exhibit A11, shown in the "Comprehensive Exhibits" File Folder, entitled **"Cannot trade Soybean Spreads"**, is a screenshot of Defendant ION Trading's RANorder Problem of #65 above on June 30, 2014.

67: Exhibit A13, shown in the "Comprehensive Exhibits" File Folder, entitled **"Problems with RAN on the QST Platform "**, is Defendant ION Trading's RANorder Problem. The same problem of Defendant ION Trading's RANorder link disconnection between the QST Platform and the Commodity Futures Exchange, on

October 3, 2014. Defendants once more failed to route and clear Plaintiffs' Trade

Order, and hence, Plaintiff was unable to protect his naked 5 ZWZ14 Wheat contracts

with 5 ZWH15 Wheat Contracts, to create a protective Spread. And this led to a

significant loss. When it rains it pours. The same Defendant ION Trading's RANorder

link disconnection problem.

68. Exhibit A14, shown in the "Comprehensive Exhibits" File Folder, entitled

**"Screenshots showing continuous disconnections on October 15, 2014"**, is

Defendant QST and/or Defendant ION Trading's RANorder Problem. This Exhibit

shows continuous breaks in Defendant ION Trading's RANorder link between the

QST Platform and the Commodity Futures Exchange on October 15, 2014.

69. Exhibit A15, shown below and in the "Comprehensive Exhibits" File

Folder, entitled **"RAN Problems of October 22, 2014"**, is the same Defendant ION

Trading's RANorder Problem -- one more disconnection on October 22, 2014.

(Exhibit A15 is the same as Exhibit A3).

---

**RAN Problems of October 22, 2014**

Bogdan Sarandan

To

bharry88@yahoo.com

Oct 22, 2014

Hi,

We just contacted RAN and it seems that they have some connection issues.

Regards,

Bogdan Sarandan.


**From:** bharry88@yahoo.com

**Sent:** Wednesday, October 22, 2014 11:57

**Subject:** uploaded client logs (22/Oct/2014 03:56:00 -> 22/Oct/2014 03:57:00)

---

THe QST-RAN live link has been disconnected since 1:00 a.m California time and I cannot execute any trades. I called KCG in Chicago and spoke to one Tony at about 1:15 a.m. California time and he could not help me but said he will contact QST and call me back. I also called RAN in Chicago but no response. This is the same problematic mess in Novermber, December 2013 and January of 2014 that caused me to lose a lot of money . Would you please find out what the problem is and fix it before the morning session begins because I am now going to bed.

### Exhibit A15

70. Exhibit A3, shown in the "Comprehensive Exhibits" File Folder, entitled **"Trading Problems of October 22, 2014"**, is the screenshot of the same Defendant ION Trading's RANorder Problem in #69 above.

71. These are some of the horrendous trading nightmares, Plaintiff went through in the hands of Defendants in 2014. There are a lot more in 2014 but they cannot all be listed because that will amount to writing a book.

72. Part B3: 2015 follows next, with no abatement of the frequent, repeated patterns of Defendants' interconnection failures with their attendant execution failures, corroborating Plaintiffs' belief that Defendants were intentionally committing these violations to destroy Plaintiff's Account, so as to benefit from Plaintiff's loss. For, this is a zero-sum game, where one person's loss is another person's gain. After all, Defendants were also trading in the Commodity Futures Market. And the following are the violations of Defendants in 2015.

**B3. Defendants' Fraudulent Misrepresentations Proven by the Consistent Pattern of Failure of their Electronic Trading Facility, Platforms and Computer Servers in 2015**

73. If the violations of Defendants were bad in 2013, worse and deadly in 2014, they were simply WANTONLY RECKLESS and INSANELY MALICIOUS in 2015. Defendants were like wild beasts of destruction, bent on putting the final nail on the coffin of Plaintiff Harry's and Draper's Trading Account # TSMPF148, in 2015.

74. As of Friday, April 3, 2015, the Total Equity in Account # TSMPF148 was $20,365. The amount had shrunken from the $25,000 Equity of January 1, 2015. Despite the assurances of Defendants to Plaintiffs that they (Defendants) had fixed their execution problems, which Plaintiff believed, Plaintiff still traded with extreme caution to ensure that he recouped all the losses and then move to a more reliable Brokerage Firm. Plaintiff was still hopeful that Defendants especially QST and ION Trading had finally cleaned up their reckless and malicious acts in the new year of January 1, 2015.

75. There were no major issues in early 2015 and Plaintiff was getting used to the new normal until April 2015, when Defendant ION Trading bared its destructive and deadly fangs, once more.

76. Exhibit B1 in the "Comprehensive Exhibits" File Folder, entitled, "**System Message for RAN Migration to its New ION Datacenter on 4-4-2015**", shows Defendant ION Trading informing Plaintiffs that ION Trading was migrating to a new Data Center starting from the weekend of April 4, 2015 and those (including Plaintiff) using the QST Platform do not need to change anything when logging in. In other words, all those using the QST Platform to trade (including Plaintiff) had nothing to worry about, with regards to the Data Center migration. Defendant QST also sent Plaintiff an email about the same data center migration.

77. With the assumption that Defendant ION Trading knew what it was doing and had multiple parallel Servers for redundancies, Plaintiff believed Defendant ION and hence, never anticipated what happened next.

78. Exhibit B2 in the "Comprehensive Exhibits" File Folder, entitled, "**Could not execute my trades on April 5, 2015 for the Monday Day Session of April 6, 2015**", shows that Defendants failed to fill the Trade Orders of Plaintiffs on 4/5/2015. Plaintiff had 5 naked ZWK15 Wheat contracts and the candlestick signal on Sunday evening trading session of 4/5/2015 opened bearish. Exhibit B3 in the "Comprehensive

Exhibits" File Folder,, entitled **"ZWN15 Chart for April 5 and 6, 2015"** attests to this fact.

79. Plaintiff immediately placed an order to short-sell 5 contracts of ZWN15 to counter the 5 naked ZWK15 contracts to protect the Account until he was certain of the direction of the wheat market. Unfortunately, Defendants failed once more to fill the Trader Order of Plaintiff as shown by Exhibit B2. Plaintiff's precarious Account was now unprotected because of Defendants intentional or willful and malicious actions on Plaintiff's Trade Orders. How could Defendant ION Trading's migration to another Data Center prevent Defendant's from routing and clearing Plaintiff's Trade orders? This was a new phenomenon and Plaintiffs was totally dumbfounded, shocked and confused.

80. Plaintiff lost at least $5,000 as of April 6, 2015 because of these intentional or willful and wantonly malicious actions of Defendants, especially Defendant ION Trading, using its Computer Servers and Programs to defraud Plaintiff. It seems there was no respite for Plaintiff from Defendants' atrocious actions to defraud Plaintiff.

81. Just trading stocks and options on Wall Street is a very difficult job. Trading Commodities in the Commodity Futures Market is even more difficult and extremely deadly. Thus, savvy Commodity Futures Traders trade Commodity Futures with extreme caution and with every possible protection. But no amount of caution, no amount of protective plans and measures, and no amount of Commodity Futures trading experience and savviness could have prepared any Commodity Futures Trader, especially Plaintiff, for the intentional or willful, manipulative and wantonly malicious actions of Defendants as described above. Defendants were bent on defrauding Plaintiff by any means possible.

82. Plaintiff thought he had seen it all but the horror movie of Defendants' intentional or willful, wanton and extremely malicious actions to defraud Plaintiff was not over. Exhibit B4 shown in the "Comprehensive Exhibits" File Folder, entitled,

"**Platform was disconnected at about 9:00 A.M., Friday, April 10, 2015, and hence could not trade** ", is a continuation of the horror movie, as Plaintiff encountered the same Defendant ION Trading problems, just like on 4/5/2015 and 4/6/2015.

83. Exhibit B5 also shown in the "Comprehensive Exhibits" File Folder, entitled, "**Rejected Order for Friday, April 10, 2015**" is the screenshot of the item #82 above.

84. Exhibit B6 shown in the "Comprehensive Exhibits" File Folder, entitled, "**Problem with execution on Sunday, April 12, 2015 for Monday, April 13, 2015 Trade**", is a continuation of the horror movie. Plaintiff again, encountered the same Defendant ION Trading problem --- Defendant ION Trading's migration to another Data Center causing Defendants to fail to fill Plaintiff's electronic trade orders.

85. Exhibit B7 shown in the "Comprehensive Exhibits" File Folder, entitled, "**Another Notice from RAN of its migration to the ION Server on April 24, 2015**", was another notice of Data Migration sent by Defendant ION Trading to Plaintiff, who no longer knew what to expect in the scenarios of the trading horror movie of Defendants' willful and egregiously malicious actions to defraud Plaintiff.

86. Exhibit B8, shown in the "Comprehensive Exhibits" File Folder, "**One more Error from QST/RAN on April 28, 2015**", is a continuation of the horror movie and the finale of Defendant ION Trading's intentional or willful and wantonly malicious acts of using its Electronic Trading Computer Servers and Programs to defraud Plaintiff. This was the last straw that broke the camel's back. Defendant ION Trading's deadly migration to another Data Center now forced Plaintiff to close out all his trading positions or get wiped out totally. It seems the horror movie had finally come to an end. Unfortunately, it was not a horror movie. It was real and Defendants had intentionally defrauded Plaintiffs wantonly, willfully and maliciously using their Electronic Trading Programs, Computer Servers and Electronic Trading Facility.

87. Plaintiff thus closed out all his open positions in the Commodity Futures Market on April 28, 2015 to save the remaining $6,621.49, so as not to be totally

wiped out by Defendants, especially ION Trading. Plaintiff thought all this was a dream but it wasn't. Defendants, especially ION Trading had destroyed Plaintiff's trading Account and reduced it from $275,000 on November 14, 2013 to a mere $6,621.49 on April 28, 2015. Wow!!! Plaintiffs are still wondering if this is a dream or for real. Simply mind-numbing

88. What is really shocking is that in this 21st Century of Parallel Servers with multiple redundancies, Defendant ION Trading would repeat the same problems from April 5, 2015 to April 28, 2015, jeopardizing its Wall Street Clients Accounts, especially in a very fast-moving and dynamically deadly Commodity Futures Market.

89. After the first Data transfer problems, why did Defendant ION Trading not leave the data of its clients on the old Servers, while moving duplicates of the data to the new Servers or new Data Center? Does it mean Defendant ION Trading did not have duplicates of its Client's data? Simply befuddling that such can occur in this 21st Century of very Advanced Technologies, especially in computing. And with so much of its Client's money on the line, Defendants, especially ION Trading did not take any precautionary measures. This is wantonly malicious recklessness or egregiously willful manipulative fraud.

90. Once is an accident, twice is a careless mistake and thrice is intentional. More than thrice is malicious willfulness or wanton recklessness. If a person rams his car on his neighbor's door, once, it could be an accident, twice an honest mistake but 30 times, is malicious intentionality or wanton recklessness. Defendants repeatedly manipulated the execution of Plaintiff's Electronic Commodity Futures Trade Orders more than 50 times, with ruthlessness, within the first five months of Account Opening. This is a well calculated, well-planned, efficiently executed, malicious and manipulative Commodity Futures Fraud, Defendants perpetrated against Plaintiff.

91. Besides, the failure of any Component or Subsystem in an Electronic Commodity Futures Trading Facility can cause the failure of the Facility and hence, the failure of the whole Electronic Trading Exchange System. To prevent such a

system-wide failure, each Component or Subsystem must always know what the other Components or Subsystems are doing at any one time. In other words, each Defendant through its Component or Subsystem Role, always knew what the other Defendants' Subsystems were doing, to have a functional, well-integrated, and highly interoperable Electronic Trading Facility, for efficient electronic order flow.

92. It is thus, mind-boggling to say the least, that Defendants were not all aware of the repetitive interconnection failures of their electronic Commodity Futures Trading Facility, more than 50 times in five months, and jeopardizing their Customers' investments. The only explanation for such callous dereliction of duty by Defendants, is that their collective unlawful acts were executed with collective malicious intent or collective wanton recklessness, to defraud their Customers, especially Plaintiff. all then Defendant were aware of the failure of their common enterprise failure for 17 full months and made no significant efforts to fix the problem, just to defraud Plaintiff.

## C.   BREACH OF FIDUCIARY DUTY UNDER CLIFORNIA LAW

## D.   DEFENDANTS' FRAUDULENT MANIPULATION OF PLAINTIFF'S ELECTRONIC TRADE ORDERS

## E.   DEFENDANTS' FRAUDULENT FAILURE TO SUPERVISE

137. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

138. There are two aspects to Defendants' Fraudulent Failure to Supervise, namely, (1) Defendant's Intentional or Egregiously Reckless Failure to Supervise Agents and Employees in violation of **NFA Rule 2.9(a)** which states as follows:

> "Each Member shall diligently supervise its employees and agents in the conduct of their commodity futures activities for or on behalf of the Member. Each Associate who has supervisory duties shall diligently exercise such duties in the

conduct of that Associate's commodity futures activities on behalf of the Member."

and (2) Enterprise-wide or Electronic Trading Facility-wide Failure to Supervise, in violation of **NFA Interpretive Notice 9046 to Rule 2.9 (Supervision of the Use of Automated Order-Routing Systems (AORS))**, parts of which state as follows:

"This Interpretive Notice applies to AORSs that are within a Member's control, including AORSs that are provided to the Member by an application service provider or an independent software vendor. While a Member is not, of course, responsible for an AORS chosen by the customer and outside of the Member's control - such as direct access systems provided by exchanges - the Member is nevertheless responsible for adopting procedures reasonably expected to address the trading, clearing, and other risks attendant to its customer relationship."

**Capacity**
"General Standard. Members who accept orders must adopt and enforce written procedures reasonably designed to maintain adequate personnel and facilities for the timely and efficient delivery of customer orders and reporting of executions. The procedures must also be reasonably designed to handle customer complaints about order delivery and reporting in a timely manner.

Members may not misrepresent the services they provide or the quality of those services. If a Member represents that it maintains a particular capacity or performance level, it must take the measures necessary to achieve that level."

"Disaster Recovery and Redundancies. The Member should have contingency plans reasonably designed to service customers if either the system goes down or activity exceeds reasonably expected peak volume needs. The Member should use redundant systems or be able to quickly convert to other systems if the need arises. These backup systems can include facilities for accepting orders by telephone or reliance on third-party brokers or clearing firms."

## 1) *FAILURE TO SUPERVISE EMPLOYEES AND AGENT*

139. Exhibit A12, shown in the "Comprehensive Exhibits" File Folder, entitled **"Problems with KCG on July 28, 2014"**, is Defendants KCG and MST Problem. This is a really bizarre problem from Defendants KCG and MST. Very early in the morning (California time) of Monday, July 28, 2014, Patrick Flynn of MST called Plaintiff on the phone and demanded he immediately get out of all his positions in the August/November 2014 Soybean Spread. Plaintiff was shocked and asked Flynn why. He told Plaintiff that Defendant KCG sent him an email he forwarded to Plaintiff and

he was following up the email with the call. He emphatically repeated that Plaintiff must close out his Soybean Spread positions immediately. Plaintiff obliged, and made a profit of $2,000 on 7/28/2014 instead of a profit of $4,437.50 or more on 7/30/3014.

140. After closing out his positions, Plaintiff was very furious and fired an email to Gail Winkers of KCG who started the process of Plaintiff being prematurely forced out of the market. It appears Gail Winkers of KCG and Patrick Flynn of MST had no clue what they were doing and forced Plaintiff out of the market on a whim, costing Plaintiff at least $2,437.50. Exhibit A12  mentioned above, describes these actions very lucidly. It seems head or tail Plaintiff loses because of Defendants' Fraud.

141. Gail Winkers who was the Assistant Vice President of Customer Service at KCG at the time, ignored Plaintiff's email (Exhibit A12) and no one at KCG cared to respond to Plaintiff's question, till date. Just outright silence from KCG.

142. The Managers or Supervisors of Barry Corbett, Jamie Leibfried and Gail Winkers of Defendant KCG failed to supervise these aforementioned Individuals, and did not even care to give any explanation to Plaintiff as to why this violation occurred, and thus, Defendants violated **NFA Rule 2.9(a)**, to continue to defraud Harry.

## 2) *RESPNDENTS' COMMON ENTERPRISE-WIDE OR ELECTRONIC TRADING FACILITY-WIDE SUPERVISORY FAILURE*

143. As succinctly described throughout all the preceding and succeeding paragraphs of the allegations, Defendants repeatedly failed to route and clear Plaintiff's Electronic Commodity Futures Trade Orders due mostly to the repeated pattern of interconnectivity failures of Defendants' disparate Electronic Trading Subsystems, networked into its Electronic Trading Facility.

144. Under **NFA Interpretive Notice 9046 to Rule 2.9 (Supervision of the Use of Automated Order-Routing Systems (AORS))**, Defendants, especially FCM-Defendants KCG and Wedbush who are NFA-registered Members-had a duty to "adopt and enforce written procedures reasonably designed to maintain adequate personnel and facilities for the timely and efficient delivery of customer orders and

reporting of executions", and "may not misrepresent the services they provide or the quality of those services". Furthermore, as Members, KCG and Wedbush "should have contingency plans reasonably designed to service customers if either the system goes down or activity exceeds reasonably expected peak volume needs" and KCG and Wedbush "should use redundant systems or be able to quickly convert to other systems if the need arises."

145. The frequency and numerosity of the repeated interconnectivity failures of Defendants, with the subsequent repeated failures of Defendants, especially the FCM-Defendants, KCG and Wedbush, to fill Plaintiff's Trade Orders in a timely manner or even at all, coupled with their inability to take any reasonable steps to correct such repeated failures from November 15, 2013 to April 28, 2015, is an indication of enterprise-wide failure of FCM-Defendants, KCG and WedBush, to supervise their employees, agents and associated persons. This egregious Supervisory Failure of Defendants was extremely detrimental to Plaintiff, and a violation of **NFA Rule 2.9.**

    **F.**  <u>**AIDING AND ABETTING FRAUD ON PLAINTIFF**</u>

    **G.**  <u>**DEFENDANTS' EMPLOYMENT OF MANIPULATIVE COMPUTER SOFTWARE PROGRAMS, COMPUTER SERVERS, ELECTRONIC TRADING FACILITY AND MANIPULATIVE SCHEME TO DEFRAUD PLAINTIFF**</u>

# VIII. CAUSES OF ACTION

FIRST CAUSE OF ACTION (<u>**FRAUDULENT CONCEALMENT**</u>)

**A1-1. Fraudulent Concealment (Based on FRCP 9(b)) by Clearing FCM-Defendant KCG, its officers, agents, employees, and introducing broker, MST and its president, Flynn, before opening the Commodity Futures Trading Account #TSMPF148, owned by Draper and Harry but under Draper's name, to Defraud Plaintiff and Draper**

201. Plaintiff re-allege and incorporate each preceding and succeeding

paragraph of the allegations with the same force and effect as if fully restated herein.

202. Patrick Joseph Flynn, President of MST, and Daniel B. Coleman (CEO of KCG), Carl Gilmore,(Head of KCG Futures), and Greg Hostetler (Chief Compliance Officer of KCG Futures) intentionally concealed from Plaintiff Harry and Draper that KCG was on the verge of bankruptcy because of its massive electronic operational failure on August 1, 2012. These Defendants also knowingly concealed from Harry and Draper the numerous lawsuits against KCG following its melt-down on August 1, 2012, or acted with reckless disregard for the truth, and denied Plaintiff Harry and Draper these information that are highly relevant to Harry and Draper in their decision to ,open a Commodity Futures Trading Account with KCG.

203. As NFA-registrants and/or controlling officers of NFA-registered entities, the aforementioned Defendants had a legal duty to disclose to Harry and Draper, the electronic operational failure of KCG on Aug. 1, 2012, KCG's financial malfeasances and litigations against KCG, in accordance with NFA Rule 2-26.

204. Plaintiff and Draper relied upon the aforementioned Defendant's Deception, unaware of KCG's massive operational failure on August 1, 2012, its near bankruptcy and the numerous litigations against KCG. Had Plaintiff and Draper known of these facts, Harry and Draper would never have opened a Commodity Futures Trading Account with KCG.

205. Owing to the concealment of the facts, Plaintiff has sustained Direct and Consequential Damages. Thus, the aforementioned Defendant are liable to Plaintiff for damages in an amount to be proven at trial.

### A1-2. Fraudulent Concealment (Based on California Law) by Clearing FCM-Defendant KCG, its officers, agents, employees, and introducing broker, MST and its president, Flynn, before opening the Commodity Futures Trading Account #TSMPF148, owned by Draper and Harry but under Draper's name, to Defraud Plaintiff and Draper

206. Under California Law, Plaintiff has to establish a Defendant's fraud by concealment or fraudulent concealment, by proving the following five elements

"(1) the defendant must have concealed or suppressed a material fact,

(2) the defendant must have been under a duty to disclose the fact to the plaintiff,

(3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff,

(4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and

(5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage."

*Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248; see also *Mosier v. Southern California Physicians Ins. Exchange* (1995) 63 Cal.App.4th 1022, 1045.)1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ~ 26,943 at 44,557-67, (Jan. 14, 1997).

207. As succinctly described in  A1-1 above, Plaintiff has established all the elements for the aforementioned Defendants Fraudulent Concealment in accordance with California Law, except element 2, duty to disclose. Based on California Law, the aforementioned DefendantS had a duty to inform Plaintiff and Draper, the financial condition of KCG, its operations and litigations against it, for Plaintiff and Draper to decide whether to do business with KCG or not. Flynn, Coleman, Gilmore and Hostetler failed to do so, in violation of California Statutes.

208. Because of the concealment of these facts by the aforementioned Defendants, Plaintiff suffered and is still suffering form the Direct and Consequential Damages of Defendants' Misconduct and the amount of damages will be proven during trial

**A2-1. Fraudulent Concealment (Based on FRCP 9(b)) by Clearing FCM-Defendant Wedbush, its officers, employees, agents, and Introducing Broker, MST and its President, Flynn, before transferring the Commodity Futures Trading Account #TSMPF148, owned by Draper and Harry but under Draper's name, From KCG to Wedbush, to defraud Plaintiff.**

209. Plaintiffs re-allege and incorporate each preceding and succeeding

paragraph of the allegations with the same force and effect as if fully restated herein.

.

### SECOND CAUSE OF ACTION (DEFENDANTS' FRAUDULENT MISREPRESENTATIONS PROVEN BY THE CONSISTENT PATTERN OF FAILURE OF THEIR ELECTRONIC TRADING FACILITY, PLATFORMS AND COMPUTER SERVERS)

**Defendants' Violations of 7 U.S.C. § 6b: Fraudulent Misrepresentations - Defendants' representations to Plaintiff Harry that their very tightly-integrated Electronic Trading Facility would handle Harry's Electronic Trade Orders with seamless flow was inaccurate and in sharp contrast to the Defendants' consistent Pattern of Failure to Seek to Obtain the Best Execution of Plaintiff's Electronic Commodity Futures Trade Orders for 17 Consecutive Months.**

211. Plaintiff re-alleges and incorporate each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

212. Through the conducts described above, Defendants Benz, Sturm and Flynn committed Fraud on Plaintiff by Misrepresenting Material facts about KCG's electronic commodity futures trading facility, especially, its interconnectivity to the Front-end Platform, QST, and the Front-end Platform itself. By engaging in this misconduct, Benz, Sturm and Flynn, violated 7 U.S.C. §§ 6b(a)(l)(A) and (C).

213. Under California Law, Intentional Fraud by Misrepresentation encompasses the following five elements:

> "(a) misrepresentation or false representation;
>
> (b) knowledge of falsity (or 'scienter');
>
> (c) intent to defraud, i.e., to induce reliance;
>
> (d) justifiable reliance; and
>
> (e) resulting damage."

> (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974; See also *Gonsalves v. Hodgson* (1951) 38 Cal.2d 91, 100-101; *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 512.)

> The representation must normally state a fact rather than an opinion. Puffing or sales talk is generally considered an opinion (unless dealing with product safety). *(Hauter v. Zogarts (1975) 14 Cal.3d 104, 112).*

A misrepresentation may be verbal, written or implied by conduct."
(*Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1567.)

"...false representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered." (*Yellow Creek Logging Corp. v. Dare* (1963) 216 Cal.App.2d 50, 55.)

"Causation requires proof that the defendant's conduct was a 'substantial factor' in bringing about the harm to the plaintiff." (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132.)

214. Thus, as alleged herein, Defendants committed egregious fraud through their repeated manipulation of Plaintiffs trade orders for 17 whole months, violating **Commodity Exchange Act 7 U.S.C. § 6b.** As a result of this intentional and maliciously reckless fraud, Plaintiffs were injured, and have suffered and continue to suffer financial damages in the form of significant monetary losses.

215. Wherefore Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION (**BREACH OF FIDUCIARY DUTY UNDER CALOFORNIA LAW**)

### FOURTH CAUSE OF ACTION (**DEFENDANTS' FRAUDULENT MANIPULATION OF PLAINTIFF'S ELECTRONIC ORDERS**)
### FIFTH CAUSE OF ACTION (**DEFENDATS FAILURE TO SUPERVISE, TO DEFRAUD PLAINTIFF**)

### SIXTH CAUSE OF ACTION (**DEFENDANTS' AIDING AND ABETTING FRAUD ON PLAINTIFF**)

### SEVENTH CAUSE OF ACTION (**DEFENDANTS' EMPLOYMENT OF MANIPULATIVE COMPUTER SOFTWARE PROGRAMS, COMPUTER SERVERS, ELECTRONIC TRADING FACILITY AND MANIPULATIVE SCHEME TO DEFRAUD PLAINTIFF**)

# X. CONCLUSION

# XI. DEMAND FOR RELIEF

Wherefore, Plaintiffs pray for relief as set forth below:

**FOR ALL CAUSES OF ACTION (FIRST THROUGH SEVENTH)**

A. Plaintiff is entitled to and hereby demand the $4,527.25 he paid Defendants for the dysfunctional Front End QST Platform.

B. Plaintiff is entitled to and hereby demand the $287,462.50 Direct Loss or Damage Cost that resulted from Defendants callous and illegal misconducts.

C. Plaintiff is entitled to and hereby demand $44.7 million in Consequential Losses or lost profits as at December 31, 2016, due to the egregiously fraudulent and maliciously reckless unlawful acts of Defendants.

D. Plaintiffs are entitled to and hereby demand pre-judgment and post-judgment interest on such monetary relief as stipulated in 28 U.S.C. 1961.

Thus, the total damage costs, Direct and Consequential Losses as of December 31, 2016 is $45 million. Plaintiff demands from Defendants, **$45 million**

# XII. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues.

Respectfully submitted

| **Bright Harry** | | **4/26/2017** |
|---|---|---|
| Plaintiff's Name | (Plaintiff's Signature | Date |