# EXHIBIT A.9



U.S. COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
www.cftc.gov

Office of Proceedings



RECEIVED CFTC

Office of Proceedings
Proceedings Clerk

**4:35 pm, May 01, 2017**

RONALD S. DRAPER,
    Complainant,

v.

MAIN STREET TRADING, INCORPORATED,
WEDBUSH SECURITIES, INCORPORATED,
KCG AMERICAS LLC, and
PATRICK J. FLYNN,
    Respondents.

CFTC Docket No. 16-R003
Served electronically

## ORDER OF DISMISSAL FOR CAUSE

*Before*:    Philip McGuire, Judgment Officer
    Commodity Futures Trading Commission,
    Washington, District of Columbia

*Appearances*:    Christopher Mader, Esq.,
    Baldwin Mader Law Group,
    Manhattan Beach, California
    For complainant

    James B. Koch, Esq.,
    Gardner Koch Weisberg & Wrona,
    Chicago, Illinois
    For respondents

### Background

By order dated March 28, 2017, I found that complainant Ronald Draper has disrupted the order of this proceeding by repeatedly disregarding two significant orders: one, my order dated March 9, 2017 which terminated electronic filing in this proceeding, principally because Draper's oversight of two electronically served orders

had rendered e-filing unreliable;[1] and two, the Commission's order dated March 17, 2017 which denied the appeal of Draper -- and his associate Bright Harry[2] -- to reverse the determination by the Director of the Office of Proceedings to strike Harry as a complainant on grounds that he lacked standing and to bar Harry from representing Draper;[3] and which directed Harry to cease and desist filing documents or communicating on Draper's behalf.[4] The Commission's order also denied Harry and Draper's appeal to reverse the Director's determination to strike various damage claims,[5] and to strike various individuals and firms named as respondents.[6]

---

[1] In addition, Draper had abused e-filing: by permitting his associate Bright Harry to file repetitive motions and to repeatedly file duplicates of voluminous, chaotically organized, exhibits (Harry has filed the lion's share of the exhibits multiple times, some as many as seven times); and by permitting Harry to repeatedly make patently preposterous *ad hominem* attacks on opposing counsel and the undersigned. Needless to say, Draper and Harry have not only needlessly disrupted this proceeding, but also have unfairly diverted scarce Commission resources from other pending reparations cases where the parties on both sides, in sharp contrast, have litigated their disputes vigorously, but with at least a modicum of good faith and civility.

[2] Draper and Harry have revealed little to nothing about Harry's background beyond Harry's aspiration to become a commodities broker and his authorship of a disquisition on citizens' sovereign rights and responsibilities titled *America, Wake Up!* (Create Space Independent Publishing 2011). (Respondents claim that Harry holds himself out as, among other things, an expert commodities trader, but have not cited the source for that claim.) Harry, who did <u>not</u> contribute any funds to Draper's account, directed the trading in Draper's account pursuant to a power of attorney, and picked and paid for the electronic trading platform which he used for that trading. Harry and Draper claim that they had an oral agreement to share any profits from Harry's trading, which Harry in turn hoped to use to set up his own commodities brokerage. This was not to be. The first month of trading, November 2013, ended with decent profits, but by the end of the third month trading in various agricultural futures had dissipated the lion's share of Draper's $275,000 investment. After thirteen months, in December 2014 when the account was transferred from KCG to Wedbush, Draper had lost all but about $28,000. Finally, when Harry closed his woeful seventeen-month run of futures trading, in April 2015, he had lost all but $6,620 of Draper's funds. *See* monthly account statements for Draper account.

[3] From October 14, 2015, when he and Harry filed the initial complaint, to April 10, 2017, when Mr. Mader e-filed a notice of appearance as Draper's counsel, Draper appeared *pro se*, as did Harry before he was booted. By letter dated March 8, 2016, the parties were advised that the Director had determined, among other things, to bar Harry's participation in this proceeding as Draper's co-complainant and as Draper's representative. By letter dated July 21, 2016, the acting Director denied Draper's and Harry's request for reconsideration of the Director's March 8th determinations.

[4] The Commission's March 17, 2017 order -- issued by the Deputy General Counsel pursuant to authority delegated by CFTC rule 12.408 – clearly warned Draper that his complaint could be dismissed if he continued to permit Harry to file documents or to communicate on his behalf.

[5] The stricken damage claims were $287,463 for "speculative" damages, $1.6 million for "punitive" damages, and $18.6 million for "lost profits."

[6] The stricken respondents were fifty John Does, a principal of a respondent, and the unregistered vendors that had provided the trading system selected by Harry.

The multiple instances where Draper and Harry blatantly disregarded the March 9th and 17th orders are detailed in the March 28th order, which is hereby incorporated by reference.[7] In the March 28th order, I found that Draper had inexcusably disrupted the order of this proceeding, and directed Draper to show why his repeated disregard of the March 9th and 17th orders does not constitute grounds for dismissing his complaint.[8]

On April 13, 2017, respondents filed a petition for an award of attorney's fees.

**Draper's response**

On April 21, 2017, Draper timely filed a response to the March 28th order to show cause and a response to respondents' petition. In both responses, Draper makes identical or substantially similar arguments:

> <u>Mr. Draper sincerely regrets the previous difficulties in this matter caused by Mr. Harry's representation</u>. Mr. Draper very much looks forward to having this matter handled professionally, respectfully and appropriately going forward. Mr. Draper assures the Judgment Officer and the Respondents that neither he nor Mr. Harry fully comprehended or appreciated the consequences of Mr. Harry's actions. Mr. Harry has no legal education or training, and simply did not understand the rules of litigation, the expectations of counsel including proper decorum, or the rules of the CFTC.

[Draper's response to respondents' petition for fees and costs, at 3rd ¶ on p. 2; underscore in original.] *See* Draper's response to order to show cause, at 7th ¶ on p. 2.

As explained below, these assurances are too late[9] and too little.[10]

---

[7] A copy of the March 28, 2017 order is attached as an appendix.
[8] On April 11, 2017, Mr. Mader filed a notice of appearance as counsel for complainant. By order dated April 11, 2017, I re-authorized e-filing and extended complainant's deadline to respond to the March 28th order to c-o-b April 21, 2017.
[9] This case is at a late stage: discovery has been closed, and respondents have filed a motion for summary disposition.
[10] In his two responses, Draper does <u>not</u>, in any meaningful fashion, disavow or acknowledge the spurious and contemptuous nature of Harry's conduct. Rather, Draper seeks to avoid any adverse consequences flowing from that misconduct, and the resulting "difficulties," by denying any knowledge or responsibility of Harry's misconduct, despite the fact that Draper signed almost all submissions and communications

**Conclusions and order**

*Dismissal sanction*

A few factors in the record hint that Harry may be exercising undue influence over Draper, a retired teacher in his seventies who, out of dozens of filings and e-mails, has sent at most a couple of isolated e-mails in his own writing, and otherwise has appeared cipher-like throughout this proceeding. Starting with the initial complaint filed October 14, 2015. Draper has signed numerous submissions drafted by Harry and has permitted Harry's solo communications, all of which are written in Harry's unique style and voice and which generally favor Harry's interests.[11] Also, Draper has inexplicably ignored respondents' repeated requests to authorize them to return the $6,280 cash balance in his account which has been dormant since April 2015.[12] However, the record contains no other red flags of undue influence.[13]

Moreover, Draper's submissions state that he still manages real estate properties and that he travels back and forth from his home and Harry's nearby residence where Draper maintains a ground-floor office and daybed. Most significantly, in a rare and

---

drafted and transmitted by Harry on Draper's behalf, and the fact that Harry copied Draper on all filings and communications whether or not signed by Draper.

[11] In addition to favoring his own interests, Harry has taken positions fundamentally adverse to Draper's interests. For example, as noted below, Draper's complaint, drafted by Harry, failed to set out any meaningful causal link between the purported glitches in the electronic trading platform and the trading losses. In this connection, Harry never even bothered to produce a complete set of account statements which would have substantiated the existence and amount of trading losses, and otherwise would have reliably clarified the factual circumstances. Thus, I asked respondents to produce a complete set of monthly account statements, because Commission rules require futures commission merchants to retain and make readily available such records. *See* CFTC rules 1.31, 1.33 and 12.34. When respondents produced the account statements, Harry drafted for Draper a response in which he inexplicably objected to my request, claiming that these (presumably reliable) business records were not relevant. *See* Draper's February 27, 2017 response to the February 17, 2017 order compelling respondents' production.

[12] On April 13, 2017, my office encouraged Mr. Mader to contact Mr. Koch for guidance on how to instruct respondents to return to Draper the account balance in his long-dormant Wedbush account.

[13] Harry's outlandish allegations that certain adverse rulings constituted a form of "elder abuse" gave rise to the notion that Harry might be projecting onto others his own impulses or actions. In this connection, I found the following brochure, and the links provided therein, to be an informative and useful guide: *A Citizen's Guide to Preventing and Reporting Elder Abuse* (California Department of Justice 2002).

recent e-mail, sent while recuperating from a recent near-fatal illness, Draper wrote in his own distinct voice and style. In sharp contrast to the many Harry-penned documents, Draper's December 9th e-mail was focused, coherent and temperate, and free of other markers of Harry's authorship, such as unconventional copious capitalization. *See* Draper's December 9, 2016, 1:45 pm e-mail to J. McGuire. Accordingly, I have determined that, on this record, Draper appears to be sufficiently competent to be held responsible for his albeit odd, stubborn decisions, and thus I find that Draper independently and knowingly permitted his associate Bright Harry to blatantly disregard the March 9th and 27th orders and thus disrupt the order of this proceeding: by employing un-necessarily combative and disrespectful litigation tactics, by drafting numerous repetitive motions for Draper's signature, and by frequently communicating with the Commission on Draper's behalf in the guise of a self-appointed co-complainant. In this connection, Draper made clear that he has fully embraced Harry's conduct and that he will continue to seek Harry's guidance:

> When I eventually get a competent Attorney for this Case, the Attorney will still work with Mr. Harry, as I am working with him currently, to prosecute these Respondent-Fraudsters. Unfortunately . . . you are stuck with Bright Harry, no matter what.

Draper's February 27, 2017 response to February 16, 2017 notice, at ¶2.

After considering each of Harry's acts of misconduct, all made with Draper's knowledge and approval, as well as the cumulative effect of these bad-faith acts, and considering the available sanctions for such abuse, I have determined that any sanctions less than dismissal of Draper's complaint would not be adequate given the repetitive and

patently contumacious nature of Harry's conduct on Draper's behalf, and the resources already wasted by the respondents and the Commission as a result of this abuse.[14]

*Attorney's fees*

In their petition for an award of their total attorney's fees and costs, respondents argue that the award is justified by the fact that Draper's complaint was meritless, and that Harry's conduct throughout the proceeding, approved by Draper, has been vexatious.

As much as the Director had sifted through Draper's and Harry's voluminous, prolix complaint and appropriately struck Harry as a party and struck numerous extraneous damage claims and respondents, the Director arguably also could have readily struck all of Draper's principal charges, particularly the core charge that Draper's losses were caused, not by adverse market forces or wrong trading decisions, but by "connectivity" glitches in the electronic trading platform provided by third-party vendors. In connection with that charge, based on the following reasons, it would not have been unreasonable to conclude that Draper had failed to provide intelligible notice of the specific problems Harry purportedly experienced trading futures, or of any specific act by respondents that caused those losses:

> One, Draper's complaint is basically an indiscriminate laundry list of almost every imaginable CFTC rule and CEA section that respondents conceivably could have violated, joined to a boiler-plate mash-up of passages from a 2013 class action complaint against KCG alleging

---

[14] One does not need to be an attorney to recognize that Harry's communications and submissions on behalf of Draper not only brazenly disregarded various orders, but also -- on their face -- were not remotely civil or reasonable. Thus, Draper's recent assertion that his *pro se* status somehow excuses his approval of Harry's conduct has no merit. In this connection, it is worth noting that the CFTC's Reparations program is expressly designed for *pro se* parties. In the almost thirty years that I have presided over reparations cases, only an infinitesimal percentage of *pro se* parties have engaged in the sort of patently bad faith, contemptuous and disruptive tactics favored by Messrs. Draper and Harry. It may be telling here that these past bad actors have almost all been respondents associated with boiler room operations.

6

violations of <u>securities</u> laws and a 2014 SEC consent order against
Wedbush concerning similar violations (Draper's Exhibits C-1 and C-2).
That is, for the most important part of the complaint – *i.e.*, the
"description of factual circumstances" -- Draper has offered little more
than a generalized, inapt description of problems with electronic securities
trading platforms which had <u>nothing</u> to do with his account. Similarly,
Draper has offered minimal documentary evidence of Harry's problems
with the QST electronic commodities trading platform in the form of
twelve e-mail exchanges between Harry and the trading platform vendor
QST. These e-mails referenced six instances of "connectivity" issues with
the QST trading platform on or about November 21 and December 26,
2013, and May 16 and 19, June 30, and October 22, 2014, and did <u>not</u> copy
any of the respondents. *See* Draper Exhibits 3, A1-a, A1-b, A4, A6, A7, A9,
A10 and A-15.

      Two, Draper failed to articulate or substantiate any plausible causal
link between any of these "connectivity" glitches and any specific related
trading loss, let alone the total trading losses which had stretched from
November 2013 to April 2015. For example, in one instance Harry
complained to QST that he could not place an order, but Draper failed to
describe that order at all, let alone in any detail, failed to explain if that
order was to enter or exit the market, failed to explain if he managed to
successfully place a subsequent similar order, and failed to calculate or
substantiate any purported damages linked to this glitch.

      Three, despite the sheer paper volume of the complaint and
notwithstanding Harry's purported trading expertise, Draper failed to
produce a scintilla of evidence describing or substantiating Harry's trading
strategy, and thus failed to show how any such strategy could have been
stymied by the connectivity glitches.

      Four, Draper failed to offer <u>any</u> explanation why Harry kept using a
purportedly defective trading system for seventeen months until the
account was too depleted to support trading.

      Five, Draper failed to explain why Harry never advised respondents
about the connectivity issues.

      Six, Draper failed to explain why he permitted Harry to continue
trading after the losses began to mount rapidly in the second month of
trading.

Striking this flimsy charge would have left a much reduced, but potentially viable,

complaint: One could still tease out a theoretically cognizable, albeit fleeting and

solitary, allegation that Wedbush had failed to provide a new risk disclosure statement

7

(which presumably would have disclosed the November 2014 SEC consent order) when the account was transferred to Wedbush in December 2014. *See* Second Amended Complaint, at ¶163.[15] Such alleged omission would have violated CFTC rule 1.65(a)(3),[16] and thus in turn violated CFTC rule 1.55[17] and Section 4b(a) of the Commodity Exchange Act.[18] If Draper could prove all the elements of such a fraud claim (*i.e.*, scienter, reliance and proximate causation in addition to presumed materiality), the ceiling for any damages proximately caused by such a violation would be $23,309, based on the total losses realized during the five months that the account was carried by Wedbush. In any event, this all means that although Draper's complaint was patently meager and overreaching, it was not absolutely meritless.[19]

The Commission has been quite reluctant to affirm awards of attorney fees against *pro se* parties in reparations cases. For example, in *Lee v. Peregrine Futures* Comm. Fut. L. Rep. ¶30,131 (2005), the Commission vacated an award of attorney's fees because it found a modicum of merit in Lee's Section 4d claim and found Lee's

---

[15] Draper did not specify CFTC rule 1.65 in the laundry list of allegedly violated rules. However, in an isolated, and opaque, fused sentence, in ¶163 of the complaint, he did essentially complain that Wedbush had failed to disclose the then-recent SEC consent order when the account was transferred to Wedbush.
[16] CFTC rule 1.65(a)(3) provides in pertinent part: "Where customer accounts are transferred to a futures commission merchant or introducing broker, other than at the customer's request, the transferee introducing broker or futures commission merchant must provide each customer whose account is transferred with the risk disclosure statements and acknowledgments required by §1.55 (domestic futures and foreign futures and options trading). . . of this chapter and received required acknowledgments within sixty days of the transfer of accounts."
[17] CFTC rule 1.55(a) provides in pertinent part: " no futures commission merchant, or in the case of an introduced account no introducing broker, may open a commodity futures account for a customer. . . unless the futures commission merchant or introducing broker first. . .[f]urnishes the customer with a separate written disclosure statement, and. . . [r]eceives from the customer an acknowledgment signed and dated by the customer that he received and understood the disclosure statement."
[18] Section 4b(a)(2)(A) of the Act provides in pertinent part: "Its shall be unlawful. . . for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market-- to cheat or defraud or attempt to cheat or defraud the other person[.]"
[19] In addition, this all underscores the fact that Draper's approval of Harry's persistent interventions has not just forced the Commission to expend scarce resources that could have been devoted to other cases, but also has served to deflect the focus of this proceeding away from an inquiry into the nature and scope of Harry's responsibility for Draper's $268,380 trading losses.

disingenuous and evasive statements, spurious arguments, attempts to circumvent rulings and threats of additional lawsuits to be merely "aggressive," but not sufficiently "wanton" to support an award of attorney's fees *Wanton* -- a colorful, but not particularly precise term -- can be used to describe a fairly wide range of gross misconduct ranging from reckless, deliberate, gratuitous, brazen and excessive, to malicious and violent.[20] Thus, *wanton* essentially serves as a high-bar "eye of the beholder" standard for the Commission. Here, Harry's abusive conduct, approved by Draper, has been at least as objectionable as was Mr. Lee's "aggressive" conduct. However, no matter how spurious and disruptive it may have been, Draper's and Harry's behavior has not been sufficiently egregious to be considered wanton, at least as far as that term was interpreted by the Commission in *Lee*.

Accordingly, because Draper's complaint is not totally without merit, because his misconduct has not been sufficiently wanton to satisfy the Commission's *Lee* standard, and because the dismissal sanction by itself is extraordinary and severe, I have determined <u>not</u> to award respondents' total attorney's fees and costs. Nonetheless, by order dated January 31, 2017, I did tentatively award respondents' their attorney's fees and costs incurred in connection with a discovery motion, based on my determination that Draper had inexcusably abused the discovery process. Respondents have established that the amount of those reasonable attorney's fees is $1,060.

---

[20] *See, e.g.*, the various definitions and synonyms set out in Black's Law Dictionary, the American Heritage Dictionary and the Oxford English Dictionary.

## Order

Pursuant to CFTC rules 12.304(i) and (m), based on complainant's repeated, contemptuous disregard of orders issued by the Commission and by the undersigned, the complaint in this matter is hereby dismissed with prejudice.

Pursuant to CFTC rules 12.30(c) and 12.304(m), based on complainant's abuse of the discovery process, complainant is ordered to pay to respondents $1,060 in attorney's fees. Payment of this award shall be made within 45 days of the date of service of this order of dismissal, unless a notice of appeal is timely filed.

Dated this 1st day of May 2017.

Philip V. McGuire,
Judgment Officer


Appendix attached: Order dated March 28, 2017.

APPENDIX:

Order to Show Cause, dated March 28, 2017



**U.S. COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
www.cftc.gov

Office of Proceedings

|   |   |
|---|---|
| RONALD S. DRAPER,<br>    Complainant,<br><br>v.<br><br>MAIN STREET TRADING, INCORPORATED,<br>WEDBUSH SECURITIES, INCORPORATED,<br>KCG AMERICAS LLC,<br>PATRICK J. FLYNN, and<br>    Respondents. | CFTC Docket No. 16-R003<br>Served via UPS |

## ORDER TO SHOW CAUSE

By Order dated March 17, 2017, the Commission dismissed the appeal of third-party Bright Harry who sought reversal of the March 2016 determination that Harry lacked standing and could not represent complainant Ronald Draper in this proceeding, and the July 2016 denial of Draper's and Harry's request for reconsideration of that determination.[1] The Commission warned Draper and Harry: one, that Harry may <u>not</u> file any further documents or otherwise communicate with any Commission staff in connection with this proceeding; two, that Harry may <u>not</u> represent, and Draper may <u>not</u> permit Harry to represent, Draper in this proceeding; and three, that Harry was to cease and desist filing documents or communicating on Draper's behalf, and that if Draper continued to permit Harry to do so, and Harry continued to do so, Draper's complaint could be dismissed. In addition, by Order dated March 9, 2017, the

---

[1] The Commission's March 17th Order, issued by the Deputy General Counsel pursuant to CFTC rule 12.408 delegated authority, dismissed Harry's appeal on grounds that it was untimely.

undersigned had terminated electronic filing in this proceeding. Unfortunately, Draper and Harry have disregarded the March 9th and 17th orders multiple times.

First, Harry disregarded the March 9th order by e-mailing a series of demands and threats to the undersigned and the Deputy General Counsel: one, a March 13, 2017 10:52 am *my legal right of standing and constitutional rights are superior* e-mail addressed to the Deputy General Counsel and demanding reversal of the determination that Harry lacked standing and could not represent Draper, and demanding that the undersigned "get the hell out of my life" and "get the hell out this matter;"[2] two, a March 14, 2017 2:46 pm *I am now taking very aggressive steps against you to protect my interests* e-mail addressed to the undersigned, alleging forgery of the Proceedings Clerk's transmittal e-mail for the order dated November 17, 2016,[3] and demanding immediate recusal and reversal of the determination that he lacked standing; and three, a March 16, 2017 2:20 pm *my final cautionary warning: the elephant grass swings and sways, the stubborn tall oak tree is torn to pieces by the ferocious wind* e-mail addressed to the undersigned and threatening various actions if the undersigned was not immediately recused. In all three e-mails, Harry identified himself incorrectly as a co-complainant. For all three e-mails, Harry copied Draper among others. Therefore, Harry presumably transmitted these three e-mails on Draper's behalf with Draper's approval.[4]

---

[2] In the original text of Harry's e-mail, the *get the hell out* language was underscored and boldfaced.
[3] The Office of Proceedings forwarded the November 17, 2016 transmittal e-mail to Draper on two separate occasions: February 28, and March 13, 2017. For these two occasions, the November 17th e-mail was pulled from different files, the first of which captures the time of an e-mail down to the second, and the second which reports the time down to the minute only. Harry bases his forgery allegation solely on what he perceives to be a four-second differential in the two reported times: *i.e.*, 1:28:04 pm *vs* 1:28 pm.
[4] *See* Draper February 27, 2017 2:09 pm e-mail to the undersigned ("All reparations [*sic*] for this case, filings to CFTC and even letters, including this one were drafted by Bright Harry and I [*sic*]. We work together to file all documents to CFTC and even the opposing party. . . . Bright Harry has his computers

2

Second, Harry disregarded the Commission's March 17th Order, as well as the March 9th Order, with a March 21, 2017 2:45 pm *my gloves are off* e-mail addressed to the Deputy General Counsel. In this e-mail, Harry expressed his displeasure with the March 17th dismissal of his appeal seeking reversal of the determination that he lacked standing and could not represent Draper. Significantly, Harry also stated his adamant intention to continue: to act as if he had standing,[5] to communicate with the Commission on his and Draper's behalf, and to draft submissions for Draper's signature.[6]

Third, Draper disregarded the Commission's March 17th Order in his application for interlocutory review, by permitting Harry: to add his name to the case title as a self-

---

upstairs at [Harry's residence] and I have my computers downstairs in my office at [Harry's residence]. We share the same ISP and telecommunications network at [Harry's residence].")

[5] Harry primarily bases his standing argument on provisions in the U.S. Constitution and the California Code of Civil Procedure that concern standing in Article III and California courts. However, the CFTC reparations forum is neither an Article III nor a California court. Rather, it is an alternative dispute resolution forum before an independent federal agency, congressionally authorized by Section 14 of the Commodity Exchange Act ("the Act"), 7 U.S.C. § 18. As noted in the Commission's March 17th Order: "[I]n the context of a reparations proceeding, [Section 14(a) of the Act provides that] a claimant must allege and prove that he or she suffered 'actual damages proximately caused' by the alleged violations." The difficulty of stretching this language into an authorization for third-party standing is underscored by the fact that third-party standing has been consistently rejected in those rare instances when it has been asserted. *See, e.g., Resolution Trust Corporation v Geldermann, Inc.*, Comm. Fut. L. Rep. ¶26,621 at 43,645-43,646, and fn. 6 at 43,646 (CFTC 1996)("[O]ur review of the legislative history of Section 14(a) yields nothing to suggest that Congress intended to confer third party standing in the reparations forum in this circumstance.") Since it was Draper, not Harry, who funded the account which was in Draper's name, it was Draper alone who suffered the loss of a large portion of those funds, and thus it is Draper alone who has standing in CFTC reparations to seek an award based on those losses.

[6] In recent submissions, Harry and Draper have confirmed what could always be readily gleaned from Draper's post-March 2016 submissions: that is, that "behind the scene" Harry has driven Draper's litigation strategy and tactics, and drafted Draper's submissions, with Draper's apparent knowledge and approval, but in an imbalanced manner that favors Harry's interests. *See* complainant's application, at page 9:

> Bright Harry has always been the Co-complainant of Ronald Draper and filed every single Document with Ronald Draper, and never once relinquished his Constitutional Right to sue and Legal Right of Standing to the CFTC. In other words, Bright Harry has always had Standing in this Matter, and will continue to do so.

[Capitalization in original.] *See also* Harry's March 21st e-mail: "[A]t the behest of Ronald Draper, I decided to allow Draper alone [to] sign all our Documents to CFTC, while operating from behind the scene, to satisfy CFTC's demand." [Underscoring added for emphasis.]

3

proclaimed co-complainant; to title the application as being filed on behalf of Draper and Harry as co-complainants; and, most significantly, to co-sign the application and notice of filing as "complainant."[7] Throughout the text of the application, Harry and Draper described themselves collectively as the "complainant<u>s</u>" and devoted a substantial portion of the application to Harry's oft-repeated argument that he has standing.[8]

Fourth, in an e-mail addressed to the Proceedings Clerk and transmitted after close of business on Friday March 24, 2017, at 5:00 pm EDT, Draper disregarded the Commission's March 17th order by permitting Harry to appear as a self-proclaimed co-complainant: in the subject line and the closing, Draper and Harry were identified as co-complainants and co-signers. Draper and Harry opened by expressing their preference for e-filing.[9] However, the e-mail was not a simple procedural inquiry, because it closed with a repeated recusal demand. Thus, Draper also disregarded the March 9th Order which only permits e-mails that are strictly procedural inquiries or requests.

Certain allowances should be made for the *pro se* status of Draper, who has a right to act as his own zealous advocate. However, this right does not grant Draper free rein to disregard orders, to file repetitive motions, to make reckless *ad hominem* attacks on opposing counsel or Commission presiding officials, or to permit a third party non-

---

[7] Draper and Harry also added to the case title the names of certain individuals as supposed respondents, in blatant disregard of the November 17, 2016 ruling which had denied Draper's motion to amend the complaint to add these individuals as respondents.

[8] Underscoring added for emphasis. *See* complainant's application for interlocutory review, at ¶¶ 1, 2, 4, 5, 7, 9, 11, 12, 18, 19, 20, 24, 25, 26, 27 and 46. By Order dated March 24, 2017, issued by the Deputy General Counsel pursuant to CFTC rule 12.408 delegated authority, the Commission dismissed complainant's application on grounds that it was untimely. In this connection, a copy of the FedEx March 21, 2017 shipping label for complainant's application is attached.

[9] Draper did not describe any concrete steps that he has taken to prevent a repeat of the oversights that had rendered e-filing unreliable.

4

lawyer to represent him in the guise of a self-proclaimed co-complainant. In Draper's recent submissions, and Harry's recent communications on Draper's behalf, Draper has repeatedly disregarded the March 9th and 17th orders, with no suggestion of prospective moderation. Coupled with the unreasonable, intemperate tone in Draper's submissions and Harry's communications, Draper's regular blatant disregard of these orders has inexcusably disrupted the order of this proceeding. Accordingly, complainant Ronald Draper is ordered to show cause, no later than April 12, 2017, why his repeated disregard of orders does not constitute grounds for dismissing his complaint, pursuant to CFTC rules 12.304(i) and (m).[10] Failure to timely and properly file a response to this order will result in dismissal.

    Dated March 28, 2017.

    Philip V. McGuire,
    Judgment Officer


Attachment: Copy of the FedEx March 21, 2017 shipping label

---

[10] Draper's and Harry's Friday March 24, 2017 e-mail was forwarded to my office after my office had issued a Monday March 27, 2017 notice that set an April 10, 2017 filing deadline for any opposition to respondents' motion for summary disposition. The filing deadline for complainant to file an opposition to respondents' motion for summary disposition is hereby suspended pending review of his response to this order to show cause.

5